**ALLSTATE INSURANCE COMPANY, Government Employees Insurance Company, Nationwide Mutual Insurance Company, North Carolina Farm Bureau Mutual Insurance Company, State Farm Mutual Automobile Insurance Company, Plaintiffs,**

v.

**Edwin S. LANIER, Commissioner of Insurance for the State of North Carolina, and T. Wade Bruton, Attorney General of the State of North Carolina, Defendants.**

Civ. No. 1352.
United States District Court
E. D. North Carolina,
Raleigh Division.
May 31, 1965.

74

J. Melville Broughton, Jr., of Broughton & Broughton, Raleigh, N. C., Herbert A. Bergson, of Bergson & Borkland, Washington, D. C., for plaintiffs.

T. Wade Bruton, Atty. Gen. of North Carolina, by Charles D. Barham, Jr., Asst. Atty. Gen., Raleigh, N. C., for defendants.

Robert H. Cowen, U. S. Atty., Raleigh, N. C., for amicus curiae—United States.

LARKINS, District Judge.

## SUMMARY

This cause comes before the Court as a civil action arising upon the plaintiffs' Complaint of March 13, 1962, wherein there was sought a declaratory judgment and an injunction.

■ Jurisdiction is established by virtue of the fact that a substantial question of construction of Acts of the Congress of the United States are presented to the Court. Neither diversity of citizenship nor amount in controversy need be alleged, although both are involved to the degree necessary in order to establish federal jurisdiction on the grounds of diversity.

■ Plaintiffs seek a declaration that § 58–247 and § 58–248.2 of Article 25 of Chapter 58 of the General Statutes of North Carolina, as amended, are in conflict with the McCarran-Ferguson Act (Title 15 U.S.C.A. §§ 1011 to 1015), and the Sherman Anti-Trust Act (Title 15 U.S.C.A. §§ 1 to 7). Plaintiffs also sought an injunction against the enforcement of these North Carolina Statutes. Plaintiffs assert that they are entitled to the relief sought because the North Carolina Statutes are unconstitutional [1] due to the fact that they are in conflict with Acts of Congress.

By their answer, defendants have admitted certain of plaintiffs' allegations,

1. Article VI, Clause 2 of the Constitution of the United States, commonly known as the "Supremacy Clause."

"This Constitution, and the Laws of the United States which shall be made

denied others, affirmatively pleaded additional facts, and have asserted a number of affirmative defenses.

On June 17, 1963, after defendants' answer of April 9, 1962, plaintiffs moved for a declaratory judgment pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. This motion is now before the Court, but injunctive relief is not sought with it.

In response to this motion, defendants filed a brief in opposition to plaintiffs' motion, and at the same time filed a cross-motion for dismissal and for judgment on the pleadings. These motions of defendants were presented to the Court on August 30, 1963.

On September 24, 1963, the United States filed a "Memorandum for the United States as Amicus Curiae," in which it joined the plaintiffs in urging that the "North Carolina Statutes should be declared unconstitutional and void."

Several extensive briefs have since been filed, and arguments have been heard in relation thereto. The case is now before the Court for the determination of plaintiffs' motion for declaratory judgment on the pleadings and defendants' cross-motions.

The Court has determined to treat the Motion for Dismissal as a Motion for Summary Judgment pursuant to Rule 12(c), Federal Rules of Civil Procedure. It is in this respect that the following FINDINGS OF FACT and CONCLUSIONS OF LAW are presented. The Court notes that matters outside the pleadings have been permitted to enter upon the record, and it therefore determines that ruling upon the matters presented as a Motion for Summary Judgment is appropriate. Ample opportunity has been given all parties to present any matter which they have felt necessary to assist the Court in making its determination.

The Court, after affording all parties a full hearing, has determined that a three-judge court should not be convened. Title 28 U.S.C.A. § 2284.

This Court, therefore, proceeds to find the following

### FINDINGS OF FACT

The North Carolina legislature has long since shown a concern for the laws and regulations surrounding automobile liability insurance, as well as a concern for other areas of insurance. The General Assembly of the State has shown a willingness to experiment in the field of insurance legislation and in rating bureaus.

In 1913, North Carolina, by statute, permitted and regulated rating bureaus formed voluntarily by some kinds of insurers, including both fire and automobile liability insurers. See Public Laws of 1913, Chapter 145.

In 1931, the General Assembly required automobile operators to carry a minimum amount of automobile liability insurance coverage, and to show financial responsibility for personal injury and property damage. This Act was patterned after a similar act sponsored by the American Automobile Association. See Public Laws of 1931, Chapter 116.

In 1933, further legislation was adopted relating to voluntary rating bureaus. See Public Laws of 1933, Chapter 283.

In 1945, after the very important decision in United States v. South-Eastern Underwriters Association, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), and the passage of the McCarran-Ferguson Act, the General Assembly instituted the Administrative Office which required all automobile liability insurance companies to be members. This Office also provided for required membership in a fire insurance rating bureau.

In 1947, the General Assembly adopted the "Motor Vehicle Safety and Respon-

in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the

Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

sibility Act." See Chapter 1006, N.C. Session Laws of 1947. This Act provided that automobile liability insurance would serve as one of the methods of establishing financial responsibility, and it set out minimum automobile liability insurance provisions.

In 1953, the "Motor Vehicle Safety and Financial Responsibility Act of 1953" was adopted by the General Assembly. Chapter 1300, N.C. Session Laws of 1953. That Act is still in force in North Carolina and provides for a certificate of insurance as one of the methods of proof of financial responsibility. Under this Act, the Commissioner of Insurance is directed to create an assigned risk plan, so that all motorists in the State can buy automobile insurance.

In 1957, North Carolina became the third state in the Union to adopt a compulsory automobile liability insurance law. Under this law, every owner of a motor vehicle in the State has to prove financial responsibility before he or she is permitted to operate a motor vehicle on the highways of North Carolina. The principle method of proving this responsibility is through the use of automobile liability insurance. Chapter 1393, N.C. Session Laws of 1957.

In 1961, amendments were made to General Statutes 58–248.2, the result of which was to delete from it that portion of the statute relating to permissible deviations from the promulgated rates, thus bringing in question this Section in conjunction with § 58–247. This latter Section being the one calling for compulsory membership in the Rating Bureau.[2]

The effect of these two statutes is to require all insurance companies selling automobile liability insurance in North Carolina to join the North Carolina Automobile Rate Administrative Office (hereinafter called the Rating Bureau), and to compel such insurers to adhere to the rates, rating plans, and classifications, and so forth, as promulgated by the Rating Bureau. These rates, rating plans and classifications are in turn ap-

**2.** § 58–247. *"Membership as a prerequisite for writing insurance; governing committee; rules and regulations; expenses; Commissioner of Insurance ex officio chairman.—*(a) Before the Commissioner of Insurance shall grant permission to any stock, nonstock, or reciprocal insurance company or any other insurance organization to write automobile bodily injury and property damage insurance in this State, it shall be a requisite that they shall subscribe to and become members of the North Carolina Automobile Rate Administrative Office.

"(b) Each member of the North Carolina Automobile Rate Administrative Office writing the above classes of insurance in North Carolina shall, as a requisite thereto, be represented in the aforesaid bureau and shall be entitled to one representative and one vote in the administration of the affairs of the bureau. They shall, upon organization, elect a governing committee which governing committee shall be composed of equal representation by stock and nonstock members.

"(c) The bureau, when created, shall adopt such rules and regulations for its orderly procedure as shall be necessary for its maintenance and operation. No such rules and regulations shall discriminate against any type of insurer because of its plan of operation, nor shall any insurer be prevented from returning any unused or unabsorbed premium, deposit, savings or earnings to its policyholders or subscribers. * * *

"(d) The Commissioner of Insurance of the State of North Carolina, or such deputy as he may appoint, shall be ex officio chairman of the North Carolina Automobile Rate Administrative Office and shall preside over all meetings of the governing committee or other meetings of the bureau and it shall be his duty to determine any controversy that may arise by reason of a tie vote between the members of the governing committee."

\* \* \* \* \*

§ 58–248.2 *"Insurance policy must conform to rates, etc., filed by rating bureau; when higher rate allowed.—*No insurer, officer, agent or representative thereof shall knowingly issue or deliver or knowingly permit the issuance or delivery of any policy of insurance in this State which does not conform to the rates, rating plans, classifications, schedules, rules and standards made and filed by the rating bureau. A rate in excess of that promulgated by the rating bureau

proved by the Commissioner of Insurance who is an elected official of the State.[3]

The role of the Rating Bureau in the business of insurance is an important one in all states, and writers of automobile liability insurance are generally permitted by state laws to join together in rating bureaus through which they jointly formulate rates, policy forms, classifications, and deal with other matters of common interest. Membership in such bureaus in the field of automobile liability insurance is predominantly voluntary.

Therefore, those insurers admitted to a particular state who do not choose to become members of a rating bureau are free, if they choose, to formulate their own rates, policy forms and classifications independently of the rating bureau.

Generally, these insurance companies, which are voluntary members of rating bureaus, and which adhere to the uniform rates, policy forms and classifications are known as *bureau companies*. Insurers which do not voluntarily belong to rating bureaus and which file their rates, classifications and coverages independently of the rating bureau are commonly known as *independent insurers*.

Of course, the independents are not altogether free from extensive state controls. In fact, rates and practices of all automobile liability insurers are subject to extensive state supervisory control in every state. This supervision and control applies equally to both bureau companies and independents.

There is, in most states, extensive competition between bureau companies and independents, as well as competition between the members of each category. The competition is not only in the form

of policy and costs of premiums, but in the manner of policy coverage.

Each of the plaintiffs in this action is a member of what is normally called the independent insurers. Except in North Carolina, and those few states which require compulsory membership in rating bureaus, each charges rates substantially below those promulgated by rating bureaus. Each company is also an innovator in developing new types of insurance coverage and new systems of classification.

Article 25 of Chapter 58 of the General Statutes of North Carolina, and more specifically §§ 58–247 and 58–248.2, requires all companies desiring to do business in this State, as a condition of doing that business, to subscribe to, and become a member of the North Carolina Automobile Rate Administrative Office. (§ 58–247).

No company selling automobile liability insurance may issue or deliver any policy of insurance "which does not conform to the rates, rating plans, classifications, schedules, rules and standards made and filed by the rating bureau." (§ 58–248.2).

Any insurer failing to comply with the above requirements would be subject to a revocation or suspension of its license to do business and might also be subject to criminal sanctions. This authority to revoke the license is vested in the Commissioner of Insurance in § 58–248.3.[4]

Prior to September 1961, the North Carolina Statutes permitted uniform deviations from the Bureau rates if such deviation was approved by the Commissioner. All licensed insurers, however, were required to be members of the Rating Bureau. § 58–248.2 was then amended by the deletion of three sentences

may be charged on any specific risk provided such higher rate is charged with the knowledge and written consent of both the insured and the Commissioner."

3. See §§ 58–248, 58–248.3, 58–248.5 and 58–248.6; and §§ 58–9 through 58–9.3, infra.

4. § 58–248.3. *"Revocation or suspension of license for violation of article.*—If the Commissioner shall find, after due notice and hearing that any insurer, officer, agent or representative thereof has violated any of the provisions of this article, he may issue an order revoking or suspending the license of any such insurer, agent, broker or representative thereof."

providing for this uniform deviation, resulting in the requirement that all insurers in North Carolina must not only be members of the Rating Bureau, but that they must also charge the same uniform and minimum rates for all insurance of the same kind.

It is to be noted that § 58–247(c) provides that plaintiffs may still compete by offering better customer service and greater convenience, as well as by payment of dividends to the established policyholders. The payment of dividends at the termination of the policy period is not the solution the plaintiffs seek, however, and there is no doubt that their policy of charging initial premium rates at an amount substantially lower than those charged by bureau companies has been foreclosed in North Carolina.

■ It is common knowledge, in North Carolina, however, that most insurers offer substantial dividends to their policyholders at the termination of the policy year. This has been a device whereby many insurers in North Carolina offer, in effect, a reduced cost of insurance in the second or subsequent purchase year. The plaintiffs are free to compete in this manner.

The Commissioner of Insurance, acting pursuant to the North Carolina Statutes, has refused to consider the reasonableness and adequacy of rates and other filings of plaintiffs on the sole grounds that they do not conform to rates, classifications, rules and standards made and filed by the Rating Bureau.

Having determined the nature of rating bureaus in general, and North Carolina specifically, their extent of control over automobile liability insurance, it is now appropriate to examine the role of the Commissioner of Insurance, his powers and his exercise of them in relation to the field of automobile liability insurance.

§ 58–5 of Article 2 of Chapter 58 of the General Statutes of North Carolina provides for the election of the Commissioner of Insurance, and his term of office. He is designated as the "chief officer of the Insurance Department * * *." [5]

§§ 58–9 through 58–9.3 of Article 2 set out the powers and duties of the Commissioner in general. § 58–9 provides that the Commissioner shall have authority to make rules and regulations to effectuate the provisions of Chapter 58. He may also "withdraw, modify or amend any such regulation." He is also given the authority to report violations to the Attorney General and he may institute both civil and criminal actions upon a determination by him that violations of this Chapter 58 have occurred.[6]

---

5. § 58–5. *"Commissioner's election and term of office.*—The chief officer of the Insurance Department shall be called the Commissioner of Insurance; * * *. He shall be elected by the people in the manner prescribed for the election of members of the General Assembly and State Officers, * * *. His term of office * * * is for four years * * *."

6. § 58–9. *"Powers and duties of Commissioner.*—The Commissioner shall:
  "(1) See that all laws of this State governing insurance companies, associations, orders or bureaus relating to the business of insurance are faithfully executed, and to that end he shall have power and authority to make rules and regulations, not inconsistent with law, to enforce, carry out and make effective the provisions of this chapter, and to make such further rules and regulations not contrary to any provision of this chapter which will prevent practices injurious to the public by insurance companies, * * *. The Commissioner may likewise, from time to time, withdraw, modify or amend any such regulation.

  *        *        *        *        *

  "(4) Report in detail to the Attorney General any violations of the laws relative to insurance companies, * * * and he shall have power to institute civil actions or criminal prosecutions either by the Attorney General or such other attorney as the Attorney General may select, for any violation of the provisions of this chapter."

§ 58–9.1 provides for having the orders of the Commissioner in writing, while § 58–9.2 provides for the authority and manner of conducting hearings and examinations as well as investigations. § 58–9.3 provides for judicial review of the orders and decisions of the Insurance Commissioner.[7]

In Article 25 of Chapter 58 of the General Statutes of North Carolina, further provisions relating to the powers and conduct of the Commissioner are provided, as well as provisions for the establishing of the Rating Bureau, its officers and employees.

It is to be noted that although the Commissioner is the ex officio chairman of the Rating Bureau, it is not from his office that the employees are taken, nor does the State fix and pay the salaries of the personnel in the Rating Bureau. § 58–248[8] provides that members of the Rating Bureau shall elect a Governing Committee from their membership in order to perform these aforesaid functions. It also provides that the Rating Bureau is the body which will promulgate rates on both automobile bodily injury and property damage insurance. This section also provides: "All such rates compiled and promulgated by such bureau shall be submitted to the Commissioner of Insurance for approval and no such rates shall be put into effect in this State until approved * * *."[9]

Next, § 58–248.1 provides for the Commissioner to revise rates if he does not approve them. He is limited to making such rate revision determinations only after holding a hearing. He may then require the Bureau to alter or change rates, classifications or classification assignments "in the manner and to the extent stated in such order" of the Commissioner.[10]

---

* * * * *

§ 58–9.1. "*Orders of Commissioner; when writing required.*—Whenever by any provision of this chapter, the Commissioner is authorized to grant any approval, authorization or permission or to make any other order affecting any insurer, insurance agent, insurance broker or other person or persons subject to the provisions of this chapter, such order shall not be effective unless made in writing and signed by the Commissioner or by his authority."

§ 58–9.2. "*Examinations, investigations and hearings; notice of hearing.*— All examinations, investigations and hearings provided for by this chapter may be conducted by the Commissioner personally or by one or more of his deputies, actuaries, examiners or employees designated by him for the purpose. All hearings shall, unless otherwise specially provided, be held at such time and place as shall be designated in a notice * * *."

§ 58–9.3. "*Court review of orders and decisions.*—(a) Any order or decision made, issued or executed by the Commissioner, except an order to make good an impairment of capital or surplus or a deficiency in the amount of admitted assets, shall be subject to review in the superior court of Wake County on petition by any person aggrieved filed within thirty days from the date of the delivery of a copy of the order or decision made by the Commissioner upon such person.

* * * * *

"(c) The trial judge shall have jurisdiction to affirm or to set aside the order or decision of the Commissioner and to restrain the enforcement thereof.

"(d) Appeals from all final orders and judgments entered by the superior court in reviewing the orders and decisions of the Commissioner may be taken to the Supreme Court of North Carolina by any party to the action as in other civil cases."

7. §§ 58–9.1, 58–9.2 and 58–9.3. Ibid.

8. § 58–248, supra.

9. § 58–248, supra.

10. § 58–248.1. "*Order of Commissioner revising improper rates, classifications and classification assignments.*— Whenever the Commissioner, upon his own motion or upon petition of any aggrieved party, shall determine, after notice and a hearing, that the rates charged or filed on any class of risks are excessive, inadequate, unreasonable, unfairly discriminatory, or otherwise not in the public interest, or that a classification or classification assignment is unwarranted, unreasonable, improper or unfairly discriminatory he shall issue an order to the bureau directing that such rates, classifications, or classification assignments be altered or revised in the manner and

Further sections provide that any member of the Bureau may appeal the decisions of the Bureau to the Commissioner, and the Commissioner may then approve determinations of the Bureau, or determine that the Bureau is in error and direct it to give further consideration to the dissenting members' proposals. If the Bureau fails to give such further consideration in a satisfactory manner, "the Commissioner shall make such order as he may see fit." [11]

There are provisions for the punishment of those who violate the provisions of Article 25.[12] There are also provisions for review of the orders of the Commissioner by means of an appeal to the Superior Court of Wake County, North Carolina.[13]

The following conduct of the Commissioner is examined in order to determine the extent of the actual exercise of the power of the Commissioner of Insurance since the amending of critical § 58–248.2 in 1961.

On August 25, 1961, the Commissioner approved proposed rate increases to become effective on September 1, 1961. This approval was made after public hearings were held, and after the Commissioner received statistical evidence. An opinion was written wherein the facts pertinent to the making of his decision were set out.

Another proposed rate change by the Bureau was made in 1963, and rejected by the Commissioner. This rejection was appealed to the Superior Court of Wake County. Additional evidence was then taken and the originally proposed rate was approved by the Commissioner, the rate to become effective on January 11, 1965.

The Commissioner has established the liability rate to be paid by the operators of motorcycles, these rates became effective on July 1, 1964. In this connection, it is noted that the Bureau did not propose any rate schedule.

Therefore, the rates of personal injury and property damage insurance in relation to automobile liability insurance is normally determined and established in the following manner:

(1) All members of the Bureau (this includes all insurers licensed to insure in the State) compile statistical information which is, in turn, recompiled and digested by the Governing Committee of the Bureau into a report.

(2) This Governing Committee, which is an elective body whose membership comes from all the members of the Bureau (each member having one vote), submits the proposed rate change to the Commissioner of Insurance.

(3) The Commissioner may then approve the proposed changes, recommend other rates and changes, or reject them. The Commissioner then makes his final determination after holding public hearings.

to the extent stated in such order to produce rates, classifications or classification assignments which are reasonable, adequate, not unfairly discriminatory, and in the public interest."

11. § 58–248.6. "*Appeal to Commissioner from decision of bureau.*—Any member of the bureau may appeal to the Commissioner from any decision of such bureau and the Commissioner shall, after a hearing held * * *, issue an order approving the decision of the bureau or directing it to give further consideration to such proposal. In the event the bureau fails to take satisfactory action, the Commissioner shall make such order as he may see fit."

12. § 58–248.4. "*Punishment for violation of article.*—Any insurer, officer, agent or representative thereof failing to comply with, or otherwise violating any of the provisions of this article, shall be guilty of a misdemeanor and upon conviction be punished by a fine of not less than one hundred dollars ($100.00) nor more than five hundred dollars ($500.00)."

13. § 58–248.5. "*Review of order of Commissioner.*—A review of any order made by the Commissioner in accordance with the provisions of this article shall be by appeal to the Superior Court of Wake County in accordance with the provisions of § 58–9.3."

(4) If the changes are rejected by the Commissioner, the Bureau may propose further rate changes to conform with the order of the Commissioner, and if a satisfactory proposal to the Commissioner is not made, then the Commissioner can proceed to effectuate his own recommendations as he sees fit.

(5) The Commissioner is required to hold public hearings after proper public notice, and his orders may be appealed from to the Superior Court of Wake County, North Carolina.

(6) It is possible to challenge the determinations of the Rating Bureau by appealing to the Commissioner as an aggrieved party. Article 25 provides that any member of the Bureau may complain and the Commissioner may then undertake action. He may also undertake action on his own initiative or upon the motion of any party aggrieved.

Before the factual setting surrounding the case at hand can be completely understood, it is necessary to trace the history of the business of insurance and the events leading up to the passage of the McCarran Act.

Prior to the McCarran Act, and prior to the momentous decision of South-Eastern Underwriters Association, the business of insurance was generally believed to be free from the effects of interstate commerce, and free from the controls of the Federal Anti-Trust statutes.

In 1944, the Supreme Court of the United States determined, for the first time, that the business of insurance was subject to the interstate commerce clause of the Federal Constitution, and that it was likewise controlled by the Sherman Anti-Trust Act, as well as the rest of the Anti-Trust legislation. This was the result of the South-Eastern decision.

The Congress of the United States then undertook to legislate in a manner so as to clarify the relations of Federal and State regulation of the business of insurance. The result was the McCarran-Ferguson Act, or McCarran Act.

Not only was the Supreme Court decision of the South-Eastern case being considered by Congress as it contemplated legislation which ultimately became the McCarran Act, but the decision of Parker v. Brown, 317 U.S. 341, 63 S. Ct. 307, 87 L.Ed. 315 (1943) was also considered in its possible effect upon the proposed legislation.

The interrelation of these two cases, and the consideration of them was as follows:

(1) To permit the States to continue to legislate in the field of insurance as they had done prior to the South-Eastern decision.

(2) To permit the States to express their interest in the business of insurance by passing or maintaining vigorous legislation, not only in matters of taxing insurance companies, but in matters of controls over insurance companies.

(3) To forbid the recurrence of the factual situation which was found in the South-Eastern case.

(4) In order to prevent the recurrence of the South-Eastern facts, to legislate in a manner as to retain Federal authority as to anti-trust matters, but otherwise allow the States free reign.

The District of Columbia had a required membership rating bureau which was passed by Congress the session prior to the passage of the McCarran Act, and this rating bureau is still operative. This District of Columbia Rating Bureau was discussed and considered prior to the passage of the McCarran Act. (D. C.Code § 35–1404).

Ten states, as well as the District of Columbia, have insurance rating bureaus with required membership of all insurers. These bureaus are concerned with such lines of insurance as Fire, Workmen's Compensation and Automobile Liability insurance. In six other states, no rating bureau exists but insurance rates are fixed by appropriate state agencies. The lines of insurance controlled in this manner are Workmen's Compensation, Casualty, Auto Bodily Injury Liability and Fire insurance.

Thirteen states require uniform rates to be charged in the above-named lines of insurance, and twelve of these allow no deviations therefrom.

The effect of the North Carolina insurance statutes are included in the above statistics.[14]

14. STATE LAWS REQUIRING MANDATORY RATING MEMBERSHIP

District of Columbia — Fire Insurance—D.C.Code Sec. 35–1404

\* Indiana — Workmen's Compensation Insurance—Burns' Ind. Stats., Sec. 39–3008

Louisiana — Fire Insurance—La.Rev.Stats., Sec. 22:1405

\* Minnesota — Workmen's Compensation Insurance—Minn.Stats., Sec. 79.11

Mississippi — Fire Insurance (Stock Cos.)—Miss.Code, Sec. 5817, 5826

\* New Jersey — Workmen's Compensation Insurance, N.J.Stats. Anno., Sec. 34:15–88, 34:15–90

\* North Carolina — (1) Fire Insurance—N.C.Gen.Stats. Sec. 58–127
(2) Workmen's Compensation Insurance—N.C.Gen. Stats. Sec. 97–103
(3) Automobile Liability Insurance—N.C.Gen.Stats. Sec. 58–247

Virginia — (1) Fire Insurance—Sec. 38.1–227
(2) Automobile Liability Insurance—Sec. 38–249

Wisconsin — Workmen's Compensation Insurance—Wis.Stats., Sec. 205.03

STATE LAWS REQUIRING MEMBERSHIP IN "A BUREAU"

Idaho — Workmen's Compensation Insurance—Ins.Code, Sec. 376

\* Pennsylvania — Workmen's Compensation Insurance—Purdon's Pa. Statutes, T. 40, Sec. 814

STATES HAVING RATES FIXED BY STATE AGENCIES

\* Arizona — Workmen's Compensation Insurance—Rev.Stats., Sec. 23–961, subsec. B

\* Colorado — Workmen's Compensation Insurance—Rev.Stats., Sec. 72–13–1

Louisiana — All Casualty Insurance

\* Massachusetts — Automobile Liability Insurance—Anno.Laws, Chap. 175, Sec. 113B

\* Texas — Fire Insurance—Automobile Liability Ins. Code Insurance—Art. 5.01
Workmen's Compensation Insurance Art. 5.55, V.A. T.S.

\* Utah — Workmen's Compensation Insurance—Ins.Code, Sec. 31–19–13

\* Missouri — Workmen's Compensation Insurance—Rev.Stats. Sec. 287.320, V.A.M.S.

\* State laws requiring no deviations from set rates in at least one line of insurance.

The purpose of the McCarran Act then, was to permit the States to continue regulating the business of insurance in the manner as previously done. At the same time, however, not to allow any such arrangements as had developed from violations of the Sherman Anti-Trust Act and which gave rise to the South-Eastern case.

Where do the North Carolina automobile liability insurance statutes fall in the Congressional scheme of insurance regulation?

## CONCLUSIONS OF LAW

At the outset it must be made clear that the decisions to be made by this Court relate to motions for declaratory judgment, or for dismissal and judgment on the pleadings. There is nothing before the Court at this time to establish the existence of a conspiracy to violate, or any attempt to coerce and intimidate the plaintiffs in violation of the Sherman Anti-Trust Act.

It is interesting to note that the plaintiffs have taken the position that the State of North Carolina, by establishing a compulsory membership rating bureau, has gone far beyond the extent of the powers authorized to the States in the McCarran Act. In effect, the plaintiffs insist the State has committed a violation of the Sherman Act [15] by establishing such stringent controls upon the business of insurance as to foreclose competition. They insist that the State is *overcontrolling* the business of insurance.

The irony of plaintiffs' position is accented by the result they seek from the argument they advance: to wit, being that the State has too much control, all controls should be removed in order to allow plaintiffs a completely free hand.

The United States as amicus curiae, on the other hand, insists that the State has failed to properly come up to the extent of regulation required by the terms of the McCarran Act. It has failed to give the Commissioner of Insurance such powers as he necessarily must have in order to prevent a majority of the members of the Rating Bureau for automobile liability insurance from conspiring together under the guise of conforming to the State enactments in order to intimidate and coerce the minority members of the Rating Bureau. The United States insists that North Carolina Statutes do not provide for enough State regulation.

The basis of this controversy was laid in the South-Eastern decision of 1944, and it is appropriate at the outset to examine that case in some detail in order to determine exactly what is forbidden. Mr. Justice Black, in speaking for the Court, set forth the following facts which are important in considering the case at hand:

"Appellees—the South-Eastern Underwriters Association (S.E.U. A.), and its membership of nearly 200 private stock fire insurance companies, and 27 individuals—were indicted in the District Court for alleged violations of the Sherman

---

15. Sections 1 and 2 of the Sherman Act, 26 Stat. 209 (1890), as amended, 15 U.S. C.A. §§ 1 and 2 (1958) read in pertinent parts as follows:

§ 1. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * * Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1–7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dol-

lars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

§ 2. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

Anti-Trust Act. The indictment alleges two conspiracies. The first, in violation of § 1 of the Act, was to restrain interstate trade in commerce by fixing and maintaining arbitrary and non-competitive premium rates * * * (in numerous listed states).

"* * * The conspirators not only fixed premium rates and agents' commissions, but employed boycotts together with other types of coercion and intimidation to force non-member insurance companies into the conspiracies, and to compel persons who needed insurance to buy only from S.E.U.A. members on S.E.U.A. terms. * * *"

The District Court dismissed the action of the United States upon the demurrer of the defendants because it was then the theory that the business of insurance was not a business as to come within the meaning of the Commerce Clause of the Federal Constitution. (See Paul v. Virginia, 8 Wall. 168, 75 U.S. 168, 19 L.Ed. 357 (1869). It followed from the holding that the business of insurance was not commerce and that the Sherman Act, as well as other acts of Congress, did not apply to the business of insurance.

The United States Supreme Court held, however, in the South-Eastern case, that an insurance company which conducts a substantial part of its business across state lines is in interstate commerce and subject to regulation by Congress. For this reason the business of insurance was not exempted from the operation of the Sherman Act. United States v. South-Eastern Underwriters Assn., 322 U.S. 533, 559–562, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944).

What then was the effect of this landmark decision? Prior to it, the States alone regulated the business of insurance, and such regulation took many forms. The States were presumed to have this power because of the belief that the business of insurance was not reached by the commerce power of the United States as provided in the Federal Constitution. The South-Eastern decision raised an alarm among the several States and among the insurance carriers too. The South-Eastern decision put in doubt the effectiveness of State regulations and taxes levied, as they then existed. Out of this concern came the McCarran Act.

The McCarran Act (Title 15 U.S.C.A. §§ 1011 through 1015) stipulated that the insurance business was subject to the Sherman Anti-Trust Act and the other Federal Anti-Trust Acts. It conditioned the application of the Anti-Trust Acts, however, upon the lack of any state law to regulate insurance.[16] It also continued the Sherman Act in application to agreements to boycott, coerce, or intimidate any insurer or insured.

---

16. Sections 1, 2 and 3 of the McCarran Act, Public Law 15, Title 15 U.S.C.A. §§ 1011, 1012 and 1013 read in pertinent part, as follows:

§ 1011. "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."

§ 1012(a) "The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

"(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided, That after June 30, 1948, * * * the Sherman Act, * * * the Clayton Act, and * * * the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law."* (Emphasis added).

§ 1013(a) * * *

"(b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation."

The South-Eastern decision found as unlawful certain conduct of a combination of insurance companies and individuals. This conduct was found to have violated the Sherman Act, and the companies were determined to be subject to this Act. The result, however, went beyond the mere declaration that such conduct was unlawful because there arose the fear that all state regulations then existing might be invalidated by reason of the business of insurance becoming subject to regulation by the Congress of the United States. It was apparent that remedial legislation by the Congress was immediately necessary.

The McCarran Act was designed to allay these fears and to clarify the confused boundaries which suddenly developed between State and Federal regulation of the insurance industry. The question of most immediate concern before Congress was the approach it should take in regulating insurance. Should the United States remove itself from the field of insurance regulation completely? Should the United States preempt the field completely by enacting a comprehensive program of regulation? Or should there be enacted a compromise which would allow the States ample authority to regulate the business of insurance, but at the same time retain enough jurisdiction of the business so as to prevent the recurrence of the factual situation which gave rise to the South-Eastern case?

A plain reading of the McCarran Act gives a ready conclusion as to the course Congress actually took. The middle ground, or compromise was enacted.

Section 1 of the McCarran Act specifically states that Congress does not intend to preempt the field by virtue of its silence. Section 2 specifically makes allowance for the preservation of State legislation. Section 2(b) provides for the retention of controls of the Anti-Trust statutes in all areas of the insurance business *"to the extent that such business is not regulated by State Law,"* and no further. (Emphasis added).

It is clear that Congress wanted the States to retain their powers of taxation and regulation over the business of insurance. It is equally clear that the McCarran Act foreclosed the possibility of any factual situation such as that found in the South-Eastern case from arising again and having offending companies hide behind the defense of lack of Federal Authority to regulate due to a lack of jurisdiction. (See Sec. 3(b) of the McCarran Act). It is also clear that if the States create monopoly control of the insurance business then that control will not be interfered with by the Federal legislation. See the emphasized portion of Section 2(b) of the McCarran Act.

Where then does the factual situation of the case at hand fall? It cannot be said that this is an organization of private companies and individuals conspiring to monopolize the business of insurance in the manner of the South-Eastern Underwriters Association. At the same time, the minimum price for all policies of any classification is set by the Rating Bureau. This Bureau is composed solely of a membership of private companies. Thus, the question arises, is Section 3(b) applicable to the type of organization used by the State of North Carolina? Is this a means of coercion and intimidation as contemplated by the McCarran Act when Section 3(b) was written, or is this the type of conduct which was contemplated in Section 2(b). We must look to the intent of Congress to resolve any doubts in this respect.

Plaintiffs argue that Congress, in passing the McCarran Act, meant to forbid all forms of compulsory membership in rating bureaus, especially if that rating bureau also set and enforced minimum prices. This must be so, they insist, for the reason that it allows some companies to coerce and intimidate other companies to comply with the price determinations. Defendants deny that action such as that involved here, where the State has established a price controlling agency, falls within the proscription of Section 3(b). They insist

that this is conduct specifically exempted from the impact of the Anti-Trust statutes by means of Section 2(b).

The Court is not convinced that the intent of Congress would be included in a bill of such far-reaching consequences as the McCarran Act by inference only. This is especially true when an organization similar to that here challenged was known to the sponsors of the Act. See District of Columbia Code § 35–1404, which was an Act requiring membership in a rating bureau. The District of Columbia Section was passed in the Session of Congress directly preceding the one in which the McCarran Act was passed, and the sponsors of the McCarran Act knew of the import and passage of § 35–1404 of the District of Columbia Code.

Also of import in this respect is the Parker v. Brown decision of the Supreme Court, that decision being handed down in 1943. (See Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943)).

Senator Pepper of Florida, in debating the effect of Section 2(b) of the Act shortly before its passage, and in light of the decision of Parker v. Brown, expressed the fear that the States might be able to legitimize conduct that would otherwise be in violation of the Anti-Trust Acts. It was his fear, as well as the fears of others, that Section 2(b) went too far in giving States powers to avoid the effect of these Anti-Trust statutes. He and President Roosevelt felt that this Section 2(b) of the bill should be left out and that Parker v. Brown decision was sufficient to protect State action which would otherwise be in violation of the Anti-Trust Acts if such conduct was by private parties. See 91 Cong.Rec., pp. 1479–1480 in reference to Senator Pepper's discussion, and its reference to letter of President Roosevelt to Senator Radcliff.

Parker v. Brown involved a suit to enjoin the enforcement of a State of California agricultural proration program. The basis of the suit was that the State plan, which was a marketing plan, was in conflict with the Federal Anti-Trust laws. The State proration plan regulated the handling, disposition, and prices of raisins produced in California. A large part of the raisins were shipped in interstate commerce. The Court held, at pages 350 through 352, 63 S.Ct. at page 313:

"We may assume for present purposes that the California prorate program would violate the Sherman Act if it were organized and made effective solely by virtue of a contract, combination or conspiracy of private persons, individual or corporate. We may assume also, without deciding, that Congress could, in the exercise of its commerce power, prohibit a state from maintaining a stabilization program like the present because of its effect on interstate commerce. Occupation of a legislative 'field' by Congress in the exercise of a granted power is a familiar example of its constitutional power to suspend state laws. (Cites).

"But it is plain that the prorate program here was never intended to operate by force of individual agreement or combination. It derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

"The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state. The Act is ap-

plicable to 'persons' including corporations, § 7, 15 U.S.C.A., and it authorizes suits under it by persons and corporations § 15. A state may maintain a suit for damages under it, (cite), but the United States may not, (cite)—conclusions derived not from the literal meaning of the words 'person' and 'corporation' but from the purpose, the subject matter, the context and the legislative history of the statute.

"There is no suggestion of a purpose to restrain state action in the Act's legislative history. The sponsor of the bill which was ultimately enacted as the Sherman Act declared that it prevented only 'business combinations' ".

What is of the utmost significance is that this decision of Parker v. Brown was considered at the time the McCarran Act was being considered and was specifically referred to on numerous occasions. Section 2(b) was written into the Act as an enunciation of the Parker v. Brown decision.

Senator Pepper feared that Section 2(b) might go too far, that it might go beyond the holding of Parker v. Brown. Senator Pepper, the most vigorous opponent of Section 2(b), held no grief with the actual theory of allowing States to act in a manner that would be forbidden if done by private individuals, rather his fear was:

"* * * The Senator [Senator Pepper is here replying to Senator O'Mahoney, a conferee on the Act] cited the Parker v. Brown case which was a case where a State approved of apportionment of the field, and the question was whether or not these companies which complied with that State decision were guilty of violating the Sherman Act or the Clayton Act, and it was held that where the State approved by law what they did, that that was all right, or rather where the State itself determined that that was the

thing to do, the companies were not violating the law." 91 Cong.Rec., p. 1480.

Then Senator Pepper expressed his fear as to Section 2(b).

"I admit I would be satisfied with the applicability of the Parker v. Brown case. * * * If only the rest of the language of the original bill were in there, [the bill without the proviso to Section 2(b)], and they were only given the right to regulate as they are given the right to do in the first part of this bill, then I am confident that the courts would hold that if they tried to legitimize a private agreement which per se violated the Sherman Act or the Clayton Act, that that would not be called regulation so as to protect them from prosecution." Ibid.

In spite of these fears as expressed by Senator Pepper, the critical Section 2(b) was adopted and it can thus be said that State regulated rating bureaus, as such, are permissible under the McCarran Act. There can be no doubt that the McCarran Act permits the State to regulate the insurance business to the extent of regulating the handling, disposition of policies, and prices paid for insurance and proceeds from claims. Parker v. Brown indicates it would go that far in the field of insurance, and Congress went at least as far as that decision with the McCarran Act. See Eastern R. Conf. v. Noerr Motors, 365 U.S. 127, 136–137, 81 S.Ct. 523, 5 L.Ed.2d 464 and footnote 17 (1961).

The plaintiffs vigorously assert the results of the Report of the Committee on the Judiciary, United States Senate, 87th Congress, 1961. Although the views expressed therein are informative and worthy of consideration, they are not controlling as to the intent of the 79th Congress which considered and passed the legislation in question in the year 1944.

Senator McCarran, after whom the Act is named, summarizes the principles behind the wording of the Act as follows:

"The Senator [referring to Senator Pepper] undoubtedly recognizes the fact that the Congress of the United States would not attempt to tell a State how and on what subject it should legislate." 91 Cong. Rec. 1478.

See Prudential Ins. Co. v. Benjamin, 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946); and California Auto Assn. v. Maloney, 341 U.S. 105, 71 S.Ct. 601, 95 L.Ed. 788 (1951).

In California State Auto Assn. v. Maloney, supra, on page 110, 71 S.Ct. on page 604, the Court had this to say,

" * * * Here (in the insurance industry), as in the banking field, the power of the state is broad enough to take over the whole business, leaving no part for private enterprise."

With this in mind, the plaintiffs have no complaint. The State has not elected to go quite that far but it has decided that it is in the best interest of the State to limit the method of competition. Keeping in mind the admonition of Senator McCarran, supra, that is a decision upon which the Courts should not pass.

There remains the question raised by the United States as amicus curiae, that is, does the North Carolina arrangement permit private insurance corporations to coerce and intimidate other private insurance carriers due to a failure of the North Carolina Statutes to provide adequate public controls. Section 3(b) of the McCarran Act is aimed at such a possibility as this.

In order to better grasp this problem presented by the United States, one might say that a state has a scale of operation in which to legislate. This scale begins, at its maximum end, with the state exercising full control of the insurance industry. That is, the state, if it so chooses, can become the only insurer in that state, it can exclude all private enterprise. California State Auto Assn. v. Maloney, supra.

As the State diminishes its power of control over the business of insurance, a certain point on this scale is reached whereat its exercise of control over the business of insurance becomes so limited as to create a vacuum which must be filled by the Federal Regulatory processes. The McCarran Act was designed to show the States where this point was on the theoretical scale. See Sections 2(b) and 3(b) of the McCarran Act.

The United States contends that the North Carolina Statutes are so far down this scale in controls as to require the intervention of Federal Legislation and more specifically the McCarran Act which, in turn, carries with it the Anti-Trust statutes. Is the State merely lending the color of authority to what would otherwise be unlawful conduct under the Sherman Act? This the State cannot do. See Asheville Tobacco Board of Trade v. Federal Trade Commission, 263 F.2d 502 (4th Cir., 1959); and Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951).

It is necessary to examine the powers of the Insurance Commissioner of the State of North Carolina in order to determine if he is so restricted in his powers, or the exercise of them, as to amount to a delegation of powers to a private rating bureau. The exercise of these powers by such bureau would amount to the coercing of dissenting insurance carriers into following the lead of the majority of insurance carriers. If this is all that the North Carolina Statute accomplishes then it will have to fall as conflicting with the Supremacy Clause of the Constitution of the United States.

The powers exercised by the Insurance Commissioner and the powers exercised by the Rating Bureau must be examined bearing ever in mind the factual situation of the South-Eastern case. The McCarran Act was passed with the view of permitting the States to continue in their exercise of previous regulatory powers while also aiming at preventing anything like the factual situation as found in the South-Eastern case from arising again.

It is immediately apparent that the facts here before the Court are in no way similar to those which developed in the South-Eastern case. All form of deviation from the standards set by the Rating Bureau are not foreclosed to plaintiffs. On the contrary, they have the privilege of continuing to compete for customers by offering, among other things, greater dividends than other competing insurance carriers. This is not the form of competition which the plaintiffs prefer but it is the form of competition selected by the legislature of North Carolina as compatible with the automobile liability insurance statutes of North Carolina.

The plaintiffs, or anyone else who is aggrieved, can protest any determinations made by the Rating Bureaus. This is clearly recourse outside the controls of the Rating Bureau, and is indeed a valuable weapon because the protest is carried to an elected official of the State who must, in turn, answer to the electorate. See §§ 58–248.1 and 58–248.6 of Art. 25, Chapter 58, North Carolina General Statutes. These provisions cannot be ignored when examining the contentions of the United States as amicus curiae.

It is the duty of the Commissioner to hold hearings prior to revising rates, and this is a two-edged sword. Not only may the voluntary members of the Rating Bureau present their contentions, but the independents, such as plaintiffs, may likewise present their contentions. See § 58.248.1. This is not what the plaintiffs seek, however, because it would not conform to their method of seeking customers. In other words, no matter what rates the Commissioner might set, plaintiffs would be unhappy for the reason that they would always seek a lower rate than that being charged by the bureau companies.

This then is the method by which the plaintiffs and the United States insist that the plaintiffs are being coerced. They are being compelled to charge rates which are not compatible with their promotional, advertising and over-all customer seeking programs.

It so happens that these designs of plaintiffs are not compatible with the statutory plan devised by the legislature of the State of North Carolina. If anything, the State is not failing to provide controls, it is forbidding a form of competition considered undesirable and has devised this method of preventing it. It is true that the plaintiffs are coerced into conforming to this scheme, but not by the other insurers, rather by the State. See § 58–248.4.

It is now apparent why the plaintiffs took the position which they did take, their position being opposed in theory to that taken by the United States. Plaintiffs do not want to see more controls provided by the State, they want less. The argument of the United States does not save the plaintiffs from compulsory membership in Rating Bureaus by forbidding the legislating of schemes providing for them, it insists on a strong Rating Bureau with its power emanating from the State authorities. This is hardly what the plaintiffs desire. Thus, when the Court examines the factual dispute at hand, it is apparent that all three approaches to the setting up of automobile liability insurance compulsory membership Rating Bureaus are permitted by the McCarran Act, and that the State provides enough controls to conform to the Section 3(b) requirements of the Act, at least as far as plaintiffs are concerned.

The plaintiffs are not concerned with being coerced into charging any specific rates. They are really complaining about the method of competition to which they are compelled to subscribe by the State in order to continue doing business in North Carolina. It is unquestioned that any coercion and intimidation in that respect is asserted by the State. See § 58–248.4 and 58–248.3.

It is a fact that the Rating Bureau is a body separate and apart from the State in that it is composed of private citizens as to its employees and Governing Committee (§ 58–247), but it is also

answerable to the Commissioner at every turn. If it does not give the Commissioner the answers he demands then he is free to act in his own right and as he "sees fit." See § 58–248.6.

It is interesting to note that the composition of the Rating Bureau is somewhat parallel with the composition of the body which set the controls over the raisin industry in California, and which was challenged in Parker v. Brown, supra. There too, the Sherman Act was brought into play as a result of federal legislation and it was determined that the State could violate the Sherman Act in its own right.

The brief history of the exercise of powers given the Commissioner under Chapter 58 also indicate that he not only has powers of control over the Rating Bureau, but he will use them.

It is seen, therefore, that Section 2(b) of the McCarran Act provides for monopolistic controls of the business of insurance so long as these controls are under the power of the State. Section 3(b) prevents the use of coercion, intimidation or boycott by agreement of private companies in order to effectuate what would be a violation of the Sherman Act in other fields of endeavor. But this Section 3(b) does not refer to action taken by a State in the exercise of that power as provided for the action of States in Section 2(b), and it is this latter situation which is found in the State of North Carolina under the challenged §§ 58–247 and 58–248.2.

### ORDER

Upon consideration of the pleadings, the briefs submitted, and oral arguments presented by counsel for the parties and the United States as amicus curiae, and the Court being informed, and it appearing that there is no material disputed issue of fact, and this Court having jurisdiction to grant relief as it has determined proper,

It is ordered that plaintiffs' Motion for Declaratory Judgment be, and the same is hereby denied.

It is further ordered that defendants' Motion for Dismissal and judgment on the pleadings be treated as a Motion for Summary Judgment as provided for under Rule 12(c), Federal Rules of Civil Procedure, and that as such, the same be, and is hereby allowed.

It is further ordered that the Clerk serve a copy of this opinion and order upon all the counsel of record.