Bill C. WAINWRIGHT, Ed S. Cook, Mrs. LeRoy Woodward, Dr. Asa G. Yancey, Fred M. Shell, T. Charles Allen, Robinson W. Schilling, Dr. Horace E. Tate and Mrs. Sara P. Mitchell, in their representative capacities as Members of the Atlanta Board of Education

v.

NATIONAL DAIRY PRODUCTS CORP.; Foremost Foods, Inc.; Pet Incorporated; Irvindale Dairies, Inc.; Atlanta Dairies Cooperative; R. L. Mathis Certified Dairy Co.; Better Maid Dairy Products, Inc.; Home Town Foods, Inc., d/b/a Foremost Dairies of the South and Foremost Farmbest; and Foremost-McKesson, Inc.

Civ. A. No. 12278.

United States District Court
N. D. Georgia,
Atlanta Division.

Sept. 30, 1969.

 

Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Latimer, Haddon & Stanfield, Atlanta, Ga., for plaintiff.

King & Spalding, Atlanta, Ga., for National Dairy Products Corp.

Heyman & Sizemore, Atlanta, Ga., for Irvindale Dairies, Inc.

Webb, Parker & Ferguson, Paul Webb, Jr., Atlanta, Ga., for Atlanta Dairies Co-op.

Fortson, Bentley & Griffin, Athens, Ga., for Better Maid Dairy Products, Inc.

Wallace, Wallace & Driebe, Jonesboro, Ga., for R. L. Mathis Certified Dairy Co.

Sanders, Hester, Holley, Ashmore & Boozer, Atlanta, Ga., for Pet, Inc.

Fisher & Phillips, Atlanta, Ga., for Home Town Foods, Inc. and Foremost-McKesson, Inc.

## ORDER

EDENFIELD, District Judge.

To facilitate the ultimate disposition of this multi-faceted antitrust action, the court asked each party to discuss the effect of the Georgia Milk Control Act on the plaintiff's case. The court will herein treat those suing as "the Board of Education of the City of Atlanta."

Plaintiff in its complaint urges that the defendants joined in a conspiracy, contract, or combination restraining trade, fixing prices, and dividing territory and customers, in violation of the Sherman Act with respect to it and other school systems in the State of Georgia. The defendants contend that the Georgia Milk Control Act, as amended in 1952, is an absolute bar to liability, or is at the very least persuasive evidence that no conspiracy in fact existed. The thrust of the defendants' argument is that milk prices were fixed for schools by the Georgia Milk Commission, established under the Milk Control Act, thereby immunizing them from federal antitrust violations.

The Milk Control Act, as originally passed in 1937, permitted the Milk Control Board to fix prices on milk sold within the state. The Act withstood several constitutional challenges, Bohannon v. Duncan, 185 Ga. 840, 196 S.E. 897 (1938); Gibbs v. Milk Control Board of Georgia, 185 Ga. 844, 196 S.E. 791 (1938); Holcombe v. Georgia Milk Producers Confederation, 188 Ga. 358, 3 S.E.2d 705 (1939), before it succumbed in Harris v. Duncan, 208 Ga. 561, 67 S.E.2d 692 (1951). The Supreme Court of Georgia, in a full bench decision, held the Act violative of state due process in its restriction on the freedom of contract. The Court found that since the milk industry was not, under its rigid definition, "affected with a public interest", price fixing was impermissible. *Contra, see,* Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934); Highland Farms Dairy v. Agnew, 300 U.S. 608, 57 S.Ct. 549, 81 L.Ed. 835 (1937).

In an effort to avoid the pitfalls cited in Harris v. Duncan, supra, the General Assembly of Georgia amended the Milk Control Act. The amended law attempted to assure a degree of price stability in the milk industry and at the same time preserve freedom of contract. Under the methods selected, the Georgia Milk Commission was authorized to establish "recommended prices" as "a guide to licensees buying or selling milk." As Georgia Code § 42–554 provides, in pertinent part:

> "As a guide to licensees buying or selling milk, the commission shall determine, from its knowledge of the

milk industry and investigations of economic and other conditions therein, what prices for milk handled or sold in each milk shed within which this law is applicable, adequately will protect the milk industry and insure a sufficient quantity of pure and wholesome milk to adults and minors, having special regard to the health and welfare of children, and be most in the public interest."

Under the Act the parties were subject to the prices recommended by the Commission, Georgia Code § 42–555.1,[1] if they failed to voluntarily remove themselves from the recommended prices by entering into and properly filing contracts meeting certain requirements. Georgia Code § 42–551.

Defendants argue that the contractual requirements of § 42–551 were so onerous they amounted to no more than a charade for price-fixing, under § 42–554. Under § 42–551, each contract must contain, among other matters, the following, which defendants consider particularly burdensome:

"(ii) The quantity of milk bought and sold or to be bought and sold.

"(iii) The identity by name and address of each person producing such milk or any part thereof.

"(iv) The exact location or locations where such milk or any part thereof was or is to be produced.

"(v) The breed or breeds of herd or herds from which such milk or any part thereof was or is to be produced, with the approximate percentage of total of any blend expressed as to each breed."

Defendants urge that these requirements realistically precluded the use of contracts to avoid the Commission's recommendations. They note that each of them dealt with up to 200 or more producers, "each producer having herds of different breeds, all of which may be subject to variance from time to time." They further state that their sources of supply often depended upon producers outside the state, when normal sources in Georgia were exhausted, yet these sources would be unknown and therefore unspecified in the contract. Defendants state that they rarely knew whose milk was sold to whom, since the milk of various producers was commingled—often before it reached the distributor's plant. Additionally, they argue that they could not set out the quantity of milk sold to the instant plaintiff, as required by § 42–551(a) (ii), since their contract with the Atlanta Board of Education is on a "needs" basis. Defendants support their argument by citation to the opinion of Fulton County Superior Court Judge Etheridge in Ward v. Big Apple Super Markets, No. B–26538, May 5, 1967, and the Supreme Court of Georgia affirmance of that case in Ward v. Big Apple Super Markets, 223 Ga. 756, 158 S.E.2d 396 (1967), holding the Milk Control Act unconstitutional. The *Ward* case involved the sale of milk by defendant below retail prices suggested by the Georgia Milk Commission. To escape the Commission's recommendation at the retail level—as opposed to the distribution level in the instant action—the defendant would have been required to comply with § 42–553:

"When a completed sale of a quantity of milk is made in a single transaction for cash upon delivery thereof [the typical retail sale], in lieu of the execution and filing of an agreement in writing with respect to such sale as above prescribed, the seller shall obtain a written receipt signed by the buyer at the time of sale show-

---

1. Section 42–555.1 provides in relevant part: "When * * * such persons have not contracted in writing with respect thereto in accordance with the requirements above prescribed and the transaction is not a single cash sale for which a receipt is given as above provided, it shall be deemed as a matter of law that the parties to the transaction intended to and have contracted that such transaction shall be pursuant to and in accordance with the order of the commission * * *."

ing * * *. [herein follow various facts about the sale]."

Judge Etheridge found that § 42–553 did not provide a reasonable alternative to acceptance—at the retail level—of the Commission's recommended prices. As he put it:

"Indeed a reading of the Act discloses that the principal business of the Milk Commission is the establishment of so-called 'recommended' prices. The Act would be practically destroyed without the features in it dealing with that subject * * *

"While there were added certain provisions of the Act such as found in Ga.Laws 1952, pp. 55, 62 (Ga.Code Ann. Title 42–553) which provide for alternative action by the retailer if it chooses not to abide by the 'recommended' price, they constitute no reasonable alternative to conformance. Indeed, the provision in the Act available to the retailer in the event of non-compliance, purporting to offer a reasonable alternative, are so administratively burdensome as to be impossible, or at least to force the retailer into compliance. Insofar as any alternative to the sale of milk at the 'recommended' price is concerned, therefore, the Court is of the opinion that none exists that is reasonable."

■■ In appealing Judge Etheridge's decision, the Milk Commission did not argue the question of reasonable alternatives under § 42–553, but attacked the Harris v. Duncan decision four-square, by arguing that milk was a product affected with a public interest. At pages 42–43 of their brief before the Georgia Supreme Court, the Commission stated that:

"In all candor, the appellant feels, that it is unnecessary to test the sufficiency of the 1952 amendments in and of themselves. It is the position of the appellant that this case will and should be decided on the basis of whether or not price regulation is constitutionally permissible when applied to the milk industry."

The Georgia Supreme Court, in its holding, stated that:

"This court in the full bench decision of *Harris v. Duncan*, 208 Ga. 561, 67 S.E.2d 692, held that the Act * * * conferring upon the Milk Control Board the authority to fix prices violates * * * the due process clause [of the Georgia Constitution] in that it restricts the freedom of contract. * * * This full bench decision can be reversed only by the concurrence of all seven Justices of this court, unless there has been some material amendment or facts that would make the question of law different from that existing in the older decisions.

"In 1952 (Ga.L.1952, pp. 55–70) the General Assembly amended the 1937 Act (Ga.L.1937, pp. 247–264), as previously amended, which amendment, as the commission contends in its brief, is an 'attempt to provide and maintain freedom of contract by providing a procedure through which contracting parties might go in order to arrive at a price of their choosing * * *' However, the commission in its brief and in oral argument concedes that the issue in the present case is whether the price fixing provision violates the Constitution, and states the case should be decided on that question, with which we agree. We find that the issue is the same as in Harris v. Duncan, 208 Ga. 561, 67 S.E.2d 692, supra, in which event the commission asks that it be overruled. Seven Justices of this court are not willing to overrule it; thus it controls this case." Ward v. Big Apple Super Markets, supra, 223 Ga. at 757, 158 S.E.2d at 397–398.

After this decision, the Milk Commission passed out of existence. Even if the Georgia Supreme Court held, *sub rosa,* that this Act was in point of fact a price-fixing statute, this does not settle the question before us in this federal antitrust matter. Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1942); Ashe-

ville Tobacco Board of Trade, Inc. v. Federal Trade Commission, 263 F.2d 502, 508 (4th Cir. 1959). The real issue involving the Milk Act is whether the identity of bids submitted to the plaintiff was due to a contract, combination or conspiracy, or was as a result of the statute. Even if we were to say that the statute is a price-fixing statute in purpose and operation under the Georgia Constitution, if the defendants conspired to charge only the recommended prices of the Commission and never to avail themselves of the opportunities which existed to escape the recommended prices, e. g., Georgia § 42–551, the Sherman Act has been violated. While the effect of the statute, as an evidentiary matter, may have led to price identity, there was no *prohibition* against using prices different from those recommended by the Commission. Indeed, § 42–551 provides that by contract, containing the terms enumerated above, parties at the wholesale level may set their own prices. There is evidence in the record that the Georgia Milk Commission accepted contracts at variance with their recommended prices. According to the affidavits of Chairman Ward, the Milk Commission did not thoroughly examine § 42–551 contracts and only returned them as unacceptable if "a brief perusal of the contract * * * indicated that the filer had a complete and total unawareness of the requirements of section 551." Ward, supplementary affidavit, Exhibit "A" to supplemental reply brief of defendant. If defendants could not reasonably comply with the contractual provisions required to escape the Commission's price recommendations, § 42–551(a) (xiii) provided another alternative:

"* * * [I]n the event there are circumstances related to any such contract which make it impracticable to stipulate as to any provision thereof as above described, with the approval of the commission which shall not be withheld unreasonably, the parties may substitute other provisions reasonably deemed by the commission to be consistent with the above expressed intentions of this section; * * *."

The alleged conspiracy to fix prices to the plaintiff might have precluded utilization of these alternatives. We can only await the submission of evidence to know. It may be that the force of the statute explains the defendants' actions, rather than the existence of a conspiracy. At this point we are unable to say as a matter of law, due to the possible statutory escapes from the Commission's price recommendations found in § 551—and not considered by the Georgia Supreme Court in *Ward*, which dealt with § 553.

To the extent that the statute proves to be an explanation for the identity of bids, it may be employed as a defense by the defendants. We are of the opinion that whatever the effect of the statute may have been on the defendants' activities, its impact cannot be changed by its subsequent invalidity under the Georgia Constitution. *Ward* should be given solely prospective treatment. Plaintiffs argue that since *Ward* overruled no clear *judicial* doctrine, but merely reiterated the principles laid down in Harris v. Duncan, supra, the decision should be given retroactive effect, depriving defendants of whatever protection the statute might afford as a matter of evidence. Earlier in this nation's judicial history such an argument would have been persuasive; now it must fall. In Norton v. Shelby County, 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178 (1886), the United States embraced the Blackstone view that judges merely discovered the law and that in reversing prior decisions, judges were merely discovering what the true law had always been. As the Court put it, an unconstitutional law:

"* * * [C]onfers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." 118 U.S. at 442, 6 S.Ct. at 1125.

■■ This view is no longer the law, and where equity and circumstance warrant, judicial decisions may be given solely prospective treatment. Linkletter v. Walker, 381 U.S. 618, 622–629, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). While the facts in each case are controlling, Simpson v. Union Oil Co., 377 U.S. 13, 24–25, 84 S.Ct. 1051, 12 L.Ed. 2d 98 (1964), we should be no more willing to give retroactive effect to the judicial overruling of a legislative statute—which plaintiff asks us to do here—than to the judicial overruling of a prior judicial decision. Chicot County Drainage District v. Baxter State Bank, 308 U.S. 371, 374, 60 S.Ct. 317, 84 L.Ed. 329 (1940); Anniston Mfg. Co. v. Davis, 87 F.2d 773 (5th Cir. 1937), aff'd., 301 U.S. 337, 57 S.Ct. 816, 81 L.Ed. 1143. The presence of a statute is as much an operative fact as a prior judicial ruling. In the instant action defendants had every reason to rely upon the 1952 amendments, which were designed to avoid the pitfalls of the Milk Control Act, struck down in Harris v. Duncan, supra. The fact that fifteen years later, in 1967, the Georgia Supreme Court found the amended statute unconstitutional, does not negate defendants' justifiable reliance on a solemn legislative pronouncement. To hold otherwise "would be manifestly unjust. It is hard to conceive of a case in which there could be stronger 'equities' in defendants' favor." Lyons v. Westinghouse Electric Corp., 235 F. Supp. 526, 537 (S.D.N.Y.1964). As one court properly put it:

> "In civil cases, unlike criminal cases, it is appropriate to recognize that businessmen must rely upon counsel, who in turn are guided by the existing precedents [and statutes] in making difficult decisions on the effect of the antitrust laws on specific business conduct. In suits for damages in such cases it is particularly appropriate to be mindful of the injustice of retroactive imposition of the penalty of treble damages." Hanover Shoe, Inc. v. United Shoe Machinery Corp., 377 F.2d 776, 789 (3d Cir. 1967), rev'd. on other grounds, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231, reh. denied, 393 U.S. 901, 89 S.Ct. 64, 21 L.Ed.2d 188.

Moreover, it is unnecessary to give retroactive application to *Ward*, in order to carry out its purpose. The Georgia Supreme Court in *Ward* was interested in prohibiting future restrictions on freedom of contract in the milk industry. Affording damages for past action under a then-valid statute—if the statute, of course, is shown to be the reason for the defendants' past action—does nothing to promote the intentions of the court. The loss of competition cannot be revived. *Lyons*, supra, 235 F.Supp. at 537.

■ Moreover, for whatever evidentiary value it may hold, defendants are not precluded from using the Act under plaintiff's argument that the action involved here was private rather than state action. Under Parker v. Brown, 317 U.S. 341, 350, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943), the Supreme Court held that the Sherman Act does not prohibit "a state or its officers or agents from activities directed by its legislature", although a "state does not give immunity to those who violated the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." 317 U.S. at 351, 63 S.Ct. at 314. In Parker v. Brown, the California Agricultural Prorate Act authorized creation of a Prorate Commission of nine members, eight appointed by the Governor, the other a state official who served as an ex-officio member. After public hearings and certain economic findings, the Commission was authorized to establish a prorate plan within an agricultural zone, upon the petition of ten producers in the zone. The Commission then appointed a program committee from nominees chosen by the producers. The program committee formulated proration marketing programs and the Commission was authorized to approve or modify their plans. The plan was instituted only after 65% of the producers owning 51% of the acreage devoted to the regulated crop ap-

proved the program. The Supreme Court, in holding that this scheme constituted state action sufficient to take it out of the reach of the antitrust statutes, stated that:

"It is the state which has created the machinery for establishing the prorate program. Although the organization of a prorate zone is proposed by producers, and a prorate program, approved by the Commission, must also be approved by referendum of producers, it is the state, acting through the Commission, which adopts the program and which enforces it with penal sanctions, in the execution of a governmental policy."

We feel that the actions of the Georgia Milk Commission constituted state action, within the meaning of Parker v. Brown. *See, also*, Allstate Ins. Co. v. Lanier, 242 F.Supp. 73 (E.D.N.C.1965), aff'd., 361 F.2d 870 (4th Cir. 1966), cert. denied, 385 U.S. 930, 87 S.Ct. 290, 17 L.Ed.2d 212. The Georgia Milk Commission functioned as a state agency within the Georgia Department of Agriculture. An elected state official, the Commissioner of Agriculture, appointed the chairman of the Milk Commission, fixed his compensation, and had dismissal power over him. Georgia Code § 42–525. The salary of the chairman was paid out of the general treasury of the State of Georgia. Under Georgia Code § 42–559, the chairman was charged with securing compliance with the Act. In addition to the chairman, a consumer member of the Commission was appointed to the board by an elected state official, the Governor. § 42–525. After Gregory v. Hamilton, 215 Ga. 735, 113 S.E.2d 395 (1960), changed the method by which the Commission was financed, under Georgia Code § 42–548, all fees collected by the Commission were paid into the general fund of the state treasury and appropriations for its daily operations came from the General Assembly as part of the regular budget of the Department of Agriculture. The Act itself set the maximum compensation members of the Commission could receive and provided the same travel and subsistence allowance for them as for other state officers and employees. § 42–525.

Sanctions were afforded to enforce the provisions of the Act, e. g., §§ 42–544, 42–9913, 42–532. Moreover, the General Assembly set strict standards to guide establishment of the Commission's price recommendations, § 42–554, full hearings were required for the revision of prices, and judicial review was provided. § 42–555.

In short, the state's hand ran throughout the statutory scheme: in the manner in which some of the Commission members were appointed, in the State Agriculture Commissioner's ultimate power over the chairman, who was the moving force in many of the Commission's actions, in placement of the Commission within the State bureaucracy, and in subjection of the agency to judicial review, to strict guidelines, and, presumably, to duties imposed on other state agencies. *Asheville Tobacco Board of Trade*, supra, relied upon by plaintiff, *see, also*, Bale v. Glasgow Tobacco Board of Trade, Inc., 339 F.2d 281 (6th Cir. 1964), presents a wholly different nucleus of facts. There, North Carolina authorized pre-existing tobacco boards of trade to make rules and regulations to handle the sale of tobacco at auction in certain market areas. Auction warehouses in the market were members of the board and served as its directors. They regulated the selling time allotted at the auctions, were unsupervised by any state authority, and were financed without resort to state funds.

Thus, plaintiff's arguments concerning state action and retroactivity do not stand as a bar to the defendants' use of the Act in the instant action. However, it is important to reiterate that the Act cannot preclude liability as a matter of law, if the plaintiff can demonstrate that defendants' activities were the result of a conspiracy, rather than the compulsion of the statute. Defendants can find shelter under Parker v. Brown, supra only if the evidence shows that their identity of bids resulted from the Milk

Act rather than from a conspiracy. In short, the Act can act as a defense only to the extent that evidence indicates that the identity of bids resulted from the force of the statute, rather than from a conspiracy.

In addition, we do not now decide if conscious parallelism alone is sufficient to take the case to the jury. The plaintiff has yet to complete discovery and therefore immediate determination of that question is premature.[2]

---

2. Of course, the Act can provide no manner of protection for any period after it was declared unconstitutional.