**GAS LIGHT COMPANY OF COLUMBUS, Plaintiff,**

v.

**GEORGIA POWER COMPANY and the Southern Company, Defendants.**

**Civ. A. No. 1338.**

United States District Court,
M. D. Georgia,
Columbus Division.

May 14, 1970.

———◆———

Albert W. Stubbs, Hatcher, Stubbs, Land, Hollis & Rothschild, Columbus, Ga., and Maxwell M. Blecher, offices of Joseph L. Alioto, San Francisco, Cal., for plaintiff.

William H. Schroder, Troutman, Sams, Schroder & Lockerman, Atlanta, Ga., and S. E. Kelly, Kelly, Champion & Henson, Columbus, Ga., for Georgia Power Co.

Terence H. Benbow, Winthrop, Stimson, Putnam & Roberts, New York City, and W. G. Scrantom, Jr., Swift, Pease, Davidson & Chapman, Columbus, Ga., for The Southern Co.

## OPINION

J. ROBERT ELLIOTT, District Judge.

This is an antitrust case brought by Gas Light Company of Columbus, a local distributor of natural gas in the Columbus, Georgia area, against Georgia Power Company, a state-wide electric utility

engaged in the sale of electricity in the Columbus area, as well as other places, and against The Southern Company, a public utility holding company, and parent of Georgia Power. In broad terms, the complaint alleges violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1–2) and Section 3 of the Clayton Act (15 U.S.C. § 14) involving a nationwide conspiracy among electric utility companies to eliminate gas as an energy source competitive with electricity. The real gist of the complaint, however, is more specific. Plaintiff is attacking as antitrust violations the following alleged acts or practices:

(a) Utilization of the demand for underground installation of electric distribution lines as an opportunity to foreclose Plaintiff as a competitor by exclusive dealings and tie-in contracts;

(b) The use of various allowances for the purpose of increasing economic pressures upon builders to accept free or reduced-cost underground installations in return for the exclusive use of electricity for all competitive energy purposes;

(c) The establishment of preferential rates and allowances; and

(d) The placing of restrictive covenants in deeds for the sale of land.

In their answers, the Defendants specifically denied the allegations of the complaint charging antitrust violations and set up the defense, pursuant to F.R. Civ.P. 12(b) (6), of failure to state a claim upon which relief may be granted. Presently before the Court for disposition is the joint motion for summary judgment filed in behalf of both Defendants on September 11, 1969.. This motion is predicated upon two separate and distinct grounds:

(a) That interstate commerce is not sufficiently involved to give this Court jurisdiction under the federal antitrust laws; and

(b) That the conduct complained of by Plaintiff is excluded from the scope of the federal antitrust laws by reason of the regulation thereof by the State of Georgia, acting through the Georgia Public Service Commission.

Because of the Court's ruling with respect to the second ground of the motion, it is not necessary to treat or deal with the first ground. Therefore, in the opinion which follows, the first ground will be disregarded.

The facts upon which Defendants' motion is based are contained in a "Stipulation of Counsel" dated August 1, 1969 and filed prior to Defendants' motion. Before dealing with the facts in any greater detail, however, it should be pointed out that the Stipulation contains a clear and succinct itemization of the practices which Plaintiff is challenging as antitrust violations. To quote:

"Plaintiff contends that pursuant to a national conspiracy between investor owned utility companies which are members of the Edison Electric Institute and in furtherance of a unilateral plan and program to suppress or eliminate competition between itself and the plaintiff, defendant Georgia Power, acting at the instance and request of, and/or ordered or authorized by its parent Southern, did the following acts:

"(a) Adopted and implemented Rate Schedule B–10–B which plaintiff contends is preferential because the 'qualifying load' consists of usages in which natural gas is competitive with electricity; plaintiff further contends that said Rate Schedule permits defendant to sell electricity for such competitive uses at less than its incremental cost;

"(b) Adopted and implemented an Underground Residential Distribution Wiring Plan which plaintiff contends constitutes a means by which Georgia Power 'bribes' general contractors to construct totally electric subdivisions and/or apartments;

"(c) Adopted and implemented a Residential Wiring Plan, Rule G, which plaintiff contends is another means of 'bribing' builders to go 'totally electric'

in single family residences and apartments;

"(d) Adopted and implemented Rate Schedule TE–2 which 'budget billing' plan, plaintiff contends, has been misrepresented and misinterpreted to constitute a guaranteed flat charge for electricity;

"(e) Used restrictive covenants in land deeds which covenants required that any building or dwelling erected on deeded property be 'total' electric."

With respect to these contentions, the parties agreed in the Stipulation that certain facts may be taken as true and correct for the purposes of this Court's ruling. As a general matter, the parties agreed that under Georgia law, regulation of the rates and services of public utilities, such as Defendant, Georgia Power Company, is vested in the Georgia Public Service Commission and agreed that Georgia Power Company is obligated by law to comply with orders of the Public Service Commission as to rates and services. The parties further agreed that all of the matters complained of by the Plaintiff, with the exception of the restrictive convenants, sub-paragraph (e) above, are subject to regulation by the Georgia Public Service Commission and that each of the challenged practices has been the subject of extensive hearings before the Public Service Commission upon complaints of Plaintiff, Atlanta Gas Light Company, and others. Finally, the parties agreed that in these hearings Plaintiff and Atlanta Gas Light Company offered a number of witnesses, including experts, and presented documentary evidence.

Further, the parties agreed to certain facts regarding each of the challenged practices enumerated above, which will now be outlined in some detail.

Georgia Power Company's Rate Schedule B–10–B is a general service rate, available to any customer who qualifies. It is used generally by commercial customers and has been in effect since 1933 with subsequent amendments, all pursuant to orders of the Georgia Public Service Commission.

Rate Schedule TE–2 is a rate for homeowners whose primary source of energy is electricity. It appears that this rate provides for budget billing, which means that the annual bill is estimated and paid in twelve equal installments, with an adjustment at the end of the year based on actual usage. This Rate Schedule was first used on January 1, 1965, pursuant to an order of the Georgia Public Service Commission.

Both B–10–B and TE–2 were the subject of an attack by Plaintiff and Atlanta Gas Light Company, another natural gas distributor, in extensive hearings before the Georgia Public Service Commission entitled:

"In Re: Georgia Power Company, File Nos. 19314, 19367, 19462, Docket No. 2027–U (Re: Investigation of Rates, Promotional Practices and Allowances of Georgia Power Company, Atlanta Gas Light Company and Gas Light Company of Columbus)."

Public hearings commenced March 21, 1967 and continued through September 1, 1967. The record before the Commission comprised 1,623 pages of testimony and cross examination thereon and a very substantial number of exhibits. At the time the Stipulation was filed, the Public Service Commission had not issued an order on that investigation. Subsequent to the filing of the Stipulation, but before oral argument on the present motion, an order was issued by the Commission, dated November 25, 1969, relating not only to B–10–B and TE–2, but to other challenged practices as well. More will be said about this order later.

With respect to Underground Residential Distribution, the Stipulation states that Defendant, Georgia Power Company, will provide underground systems of electrical connections for homes and apartments as an alternate to the usual overhead system, even though the cost of underground is in most cases in excess of the cost for overhead distribution facilities. Georgia Power Company

filed with the Georgia Public Service Commission in 1967 its application for approval of its proposed plan for obtaining reimbursement of this excess in cost. Plaintiff and Atlanta Gas Light Company entered their objections to the proposed plan. Public hearings were thereafter held by the Commission on Georgia Power's plan, as well as on the objections filed by the gas companies. The Commission issued an order on June 28, 1968 (attached to the Stipulation as Exhibit C) disapproving and disallowing the plan submitted by the Georgia Power Company. In lieu of the proposed plan, the Commission devised a plan of its own and ordered the Power Company to follow it. This order states in part:

"WHEREFORE IT IS ORDERED: That the plan submitted on November 14, 1967 by Georgia Power Company be and the same is hereby disallowed.

"ORDERED FURTHER: That Georgia Power Company shall obtain a contribution in aid-of-construction * * *

"ORDERED FURTHER: That Georgia Power Company will redeem the certificate held by the property owner * * *

"ORDERED FURTHER: That Georgia Power Company shall calculate the contribution in aid-of-construction * * * and file the same with the Commission for specific approval."

Subsequently, on motions for reconsideration, another order entitled "First Amendatory Order" was issued on November 18, 1968. This order is attached to the Stipulation as Exhibit D. The Commission again disallowed the original plan submitted by Georgia Power Company and "ordered" Georgia Power Company to adopt and comply with a plan substituted by the Commission. According to the Stipulation, Atlanta Gas Light Company is presently appealing these decisions of the Georgia Public Service Commission to the Superior Court of Fulton County, Georgia; but, for some reason, Plaintiff did not choose to exercise its right to a court review of the Commission's orders.

The Residential Wiring Plan of Defendant, Georgia Power Company, Rule G, is a plan inaugurated by Georgia Power Company on January 1, 1960, pursuant to an order of the Georgia Public Service Commission. In 1961, an attack was made upon this wiring plan and public hearings were held before the Georgia Public Service Commission. While neither Plaintiff nor Atlanta Gas Light Company were parties, officials of both companies testified against the plan. The Commission upheld the plan by order dated August 29, 1961. In its four page decision, attached to the Stipulation as Exhibit E, the Commission found that the Residential Wiring Plan was "in the best interest of the general public and should, therefore, remain in effect." Whereupon, the Company was ordered to follow the plan as filed and in a subsequent order dated December 19, 1962 (attached to the Stipulation as Exhibit F), the plan was extended for another ten-year period.

The Stipulation contains information regarding the restrictive convenant attacked in sub-paragraph (e) of Plaintiff's contentions as set forth above. Subsequent to the filing of the Stipulation, the Supreme Court of Georgia rendered a decision invalidating this restrictive covenant on grounds of state law. Gas Light Company of Columbus v. Georgia Power Company, 225 Ga. 851, 171 S. E.2d 615 (1969). As already pointed out, no contention was made that this conveyance was subject to regulation by the Georgia Public Service Commission, and, since this decision is being confined to conduct that is so regulated, this will be discussed no further.

Reference has already been made to a decision of the Georgia Public Service Commission dated November 25, 1969, relating to Georgia Power's Rate Schedules B–10–B and TE–2, as well as to its Residential Wiring Plan. That order was quoted extensively during oral argument on the motion. In this order the Commission held that Rate Schedule TE–

2 is "just, fair and equitable for the residential classes of service" and "ORDERED * * * that Rate Schedule TE–2, as presently authorized, be retained in [its] present form." The Commission also found that the Residential Wiring Plan should "not be disturbed at this time" and "ORDERED FURTHER: That Georgia Power Company Residential Wiring Plan, as approved in Docket No. 1614–U which is now a part of the General Rules and Regulations for Electric Service, be retained and continued in force until January 1, 1973, at which time said Wiring Plan shall be terminated." Finally, the Commission held that Georgia Power Company's Rate Schedule B–10–B "is impractical in its application" and "ORDERED FURTHER: That Georgia Power Company General Service Rate Schedule B–10–B be revised" in a manner prescribed by the Commission.

It is interesting to note that in each of the Public Service Commission decisions referred to above there is a paragraph to the effect that "jurisdiction over this proceeding is expressly retained for the purpose of entering any further order or orders as this Commission may deem mete and proper." The Court construes this provision of each order as meaning that the Commission does expressly reserve jurisdiction in an attempt to insure the general public, as well as the competitors of Georgia Power Company, of the Commission's availability to review any of the plans at any time and to modify, alter or terminate any of the plans should the Commission determine that such action would be in the public interest.

Turning now to legal issues, the question for determination is whether the regulation, as set forth above, by the State of Georgia, acting through the Georgia Public Service Commission, of the practices under attack, is sufficient to exclude them from the scope of the federal antitrust laws.

The principal case cited by Defendants in support of the affirmative of this proposition is Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315, decided by the United States Supreme Court in 1943. In that case the State of California had set up administrative machinery to control the harvesting and marketing of agricultural commodities. Specifically, the case involved a proration plan for raisin growers and distributors which restricted competition among growers and maintained prices to packers. Directing itself to the attack made that the plan was in violation of the Sherman Act, the court assumed that the plan "would violate the Sherman Act if it were organized and made effective solely by virtue of a contract combination or conspiracy of private persons, individual or corporate." The Court held, however, that the Sherman Act does not apply to state approved action:

"But it is plain that the prorate program here was never intended to operate by force of individual agreement or combination. It derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

"The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state. The Act is applicable to 'persons' including corporations [§ 7], and it authorizes suits under it by persons and corporations [§ 15]. A state may maintain a suit for damages under it, Georgia v. Evans, 316 U.S. 159 [62 S.Ct. 972, 86 L.Ed. 1346], but the United States may not, United States

v. Cooper Corp., 312 U.S. 600 [61 S. Ct. 742, 85 L.Ed. 1071]—conclusions derived not from the literal meaning of the words 'person' and 'corporation' but from the purpose, the subject matter, the context and the legislative history of the statute.

"There is no suggestion of a purpose to restrain state action in the Act's legislative history. The sponsor of the bill which was ultimately enacted as the Sherman Act declared that it prevented only 'business combination.' 21 Cong. Rec. 2562, 2457; see also at 2459, 2461. That its purpose was to suppress combinations to restrain competition and attempts to monopolize by individuals and corporations, abundantly appears from its legislative history." 317 U.S. at 350–351, 63 S.Ct. at 313.

■ Gas Light Company of Columbus attempts to distinguish *Parker* by characterizing the immunity as limited to conduct performed by agents of the state government at the specific command of the state legislature. In addition, Plaintiff contends that where, as here, there is any private action in the preparation or submission of plans for approval, *Parker* does not apply. Both of these arguments are without merit. As to the first, immunity was in fact accorded those private individuals in *Parker* who acted pursuant to the state's command. As to the second argument, the Supreme Court in *Parker* rejected the claim that the plan violated the Sherman Act because it required approval by a referendum of producers as well as the State Commission, and because the plan was initiated by request of a group of prominent producers, rather than the state. 317 U.S. at 352, 63 S.Ct. 307. Finally, Plaintiff quotes the following language from the Court's opinion in *Parker:*

"A state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful, Northern Securities Company v. United States, 193 U.S. 197, 332 [344–347, 24 S.Ct. 436, 454, 459–461, 48 L.Ed.

679] * * *." 317 U.S. at 351, 63 S. Ct. at 314.

In *Northern Securities* the contention was made that the defendant corporation was exempt from the antitrust laws because it had obtained a charter from the state and because its actions were within the charter authority. The Court summarily rejected this argument and held that simply because the state had issued a corporate charter, it could not immunize the chartered corporation from all federal statutory control. Applying the quoted language to the case at bar, just because an industry is regulated or because a regulatory scheme has been set up by the state, the antitrust laws will not automatically be disregarded. No contention has been made by Defendants that the antitrust laws are impliedly repealed as to their conduct just because Georgia Power Company is a regulated public utility. To the contrary, the Defendants are claiming that the specific practices which are being attacked are the result of legislative action by the state and thus within the *Parker* immunity. The Supreme Court of Georgia has said:

"As we have previously noted, when the commission establishes a rate, such act is legislative in character, and binds all parties concerned in the same manner as if the rate had been fixed by an act of the General Assembly." Ga. Public Service Commission v. Atlanta Gas Light Company, 205 Ga. 863, 883, 55 S.E.2d 618, 630 (1949).

In other words, it is the conduct under attack for which immunity is being sought—not the corporate person of Georgia Power Company. Viewing the matter in this light, Plaintiff is really attacking the orders of the Georgia Public Service Commission.

■ An examination of subsequent cases demonstrates a consistent pattern of the application of the *Parker* principle and indicates that the case is still viable. In 1966, the Fourth Circuit Court of Appeals, in Allstate Insurance Co. v. Lanier, 361 F.2d 870, gave consideration

to an attack by several insurance companies upon a law of the State of North Carolina which required the companies to belong to a bureau of private persons which fixed rates and submitted them to the state for approval. The basis of the attack was that such a plan violated the Sherman Act. The District Court held, 242 F.Supp. 73 (1965), on the basis of Parker v. Brown, supra, that the activity in question was exempt because of the action of the state. The District Court found that the fact of the bureau being made up of private individuals, and not government officials, made no difference, since the bureau was answerable to the State Commission. On appeal, the Fourth Circuit stated:

"The District Court's finding in the present case that the North Carolina Rating Bureau was operated under the active supervision of the state is not challenged in this court, and we find no merit in the distinction suggested by appellants between the injunction sought in Parker v. Brown and the declaration of pre-emption sought here. The essential question in both cases is whether a program of regulations established and actively supervised by a state is subject to the antitrust laws. Absent congressional action departing from the rule of Parker v. Brown, the North Carolina statutory plan is clearly valid."

E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority, 1 Cir., 362 F. 2d 52 (1966), is a similar restatement of the *Parker* doctrine. In that case, the defendant Port Authority had granted to one operator the right to operate an airport in Boston, and the plaintiff charged that the effect of this practice was to put him out of business. Again, it was held that:

"What was done here was in the exercise of a valid governmental function. The antitrust laws are aimed at private action, not governmental action."

In Sun Valley Disposal Co., Inc. v. Silver State Disposal Co., 420 F.2d 341 (1969), the Court of Appeals for the Ninth Circuit affirmed the grant of a motion for summary judgment where a county commissioner, pursuant to state legislation, issued an exclusive franchise for garbage pickup to a competitor of the plaintiff. Granting that the arrangement would violate the Sherman Act if applicable, the Court held that the federal antitrust laws do not apply to exclusive arrangements made by local governments under the authority of state laws, even where they are anti-competitive. *Parker* was relied upon in Wainwright v. National Dairy Products Corp., 304 F.Supp. 567 (1969), decided by the District Court for the Northern District of Georgia. The Court held that the Milk Control Act of Georgia, to the extent that it fixed prices at which milk could be sold in Georgia, could immunize an alleged conspiracy under the federal antitrust laws to fix milk prices. In commenting on Parker v. Brown, the Court said:

"We feel that the actions of the Georgia Milk Commission constituted state action, within the meaning of Parker v. Brown. See, also, Allstate Ins. Co. v. Lanier, 242 F.Supp. 73 (E.D. N.C.1965), aff'd. 361 F.2d 870 (4th Cir. 1966), cert. denied, 385 U.S. 930, 87 S.Ct. 290, 17 L.Ed.2d 212. The Georgia Milk Commission functioned as a state agency within the Georgia Department of Agriculture. An elected state official, the Commissioner of Agriculture, appointed the chairman of the Milk Commission, fixed his compensation, and had dismissal power over him. Ga.Code § 42–525. The salary of the chairman was paid out of the general treasury of the State of Georgia. Under Ga.Code § 42–559, the chairman was charged with securing compliance with the Act. In addition to the chairman, a consumer member of the Commission was appointed to the board by an elected state official, the Governor, Section 42–525. After Gregory v. Hamilton, 215 Ga. 735, 113 S.E.2d 395 (1960), changed the method by which the Commission was financed, under Ga.Code § 42–548, all fees collected by the Commission were

paid into the general fund of the state treasury and appropriations for its daily operations came from the General Assembly as part of the regular budget of the Department of Agriculture. The Act itself sets the maximum compensation members of the Commission could receive and provided the same travel and subsistence allowance for them as for other state officers and employees. Section 42–525.

"Sanctions were afforded to enforce the provisions of the Act, e.g., §§ 42–544, 42–9913, 42–532. Moreover, the General Assembly set strict standards to guide establishment of the Commission's price recommendations, § 42–554, full hearings were required for the revision of prices, and judicial review was provided. § 42–555.

"In short, the state's hand ran throughout the statutory scheme: in the manner in which some of the Commission members were appointed, in the State Agriculture Commissioner's ultimate power over the chairman, who was the moving force in many of the Commission's actions, in placement of the Commission within the state bureaucracy, and in subjection of the agency to judicial review, to strict guidelines, and, presumably, to duties imposed on other state agencies." 304 F.Supp. at 574.

Finally, *Parker*, *Wiggins* and *Sun Valley Disposal* were cited by Judge William B. Jones, of the District Court for the District of Columbia, in Hecht v. Pro-Football, Inc., 312 F.Supp. 472 (decided April 16, 1970), in sustaining the Defendant's motion for summary judgment in a Sherman Act complaint wherein it was charged that a long term lease of a football stadium was an unreasonable restraint on competition. Pointing out that legislation had created the lessor Board and had conferred upon it broad powers to construct and operate a stadium, the Court concluded that "the leasing of the stadium was pursuant to the mandate of the Act and was governmental action. * * * No violation of the [Sherman] Act can be made out even where there is

a restraint upon trade or monopolization if it resulted from valid governmental action."

The Court is of the opinion that the principles of law set forth in the cases above, as applied to the specific facts of this case, demand the conclusion that the regulation by the State of Georgia, acting through the Georgia Public Service Commission, of the practices which have been challenged as antitrust violations, is sufficient to exclude these challenged practices from the scope of the federal antitrust laws, for the reasons hereinafter set forth.

The Constitution of the State of Georgia, Article IV, Section I, Paragraph I, provides:

> "The power and authority of regulating * * * charges of public utilities for their services, of preventing unjust discriminations, and requiring r e a s o n a b l e and just rates * * * and of charges of public utilities, are hereby conferred upon the General Assembly, whose duty it shall be to pass laws from time to time, to regulate such tariffs and charges, to prohibit unjust discriminations by the various * * * public utilities of this State, and to prohibit * * * public utilities from charging other than just and reasonable rates and to enforce the same by adequate penalties. * * * *"

In addition, Article IV, Section IV, Paragraph III, of the Constitution states:

> "There shall be a Public Service Commission for the regulation of utilities, vested with the jurisdiction, powers and duties now provided by law or that may hereafter be prescribed by the General Assembly, not inconsistent with other provisions of this Constitution. Such Commission shall consist of five members, who shall be elected by the people. A chairman shall be selected by the members of the Commission from its membership. * * * The qualifications, compensation, filling of vacancies, manner and time of election, power and duties of members

of the Commission, including the chairman shall be such as are now or may hereafter be provided by the General Assembly."

Subsequently, the Georgia General Assembly enacted into law all those things contemplated by the preceding constitutional provisions. These laws created the Georgia Public Service Commission, prescribed the number of commissioners, their election and terms of office, their qualifications, the oath of office, the method of filling vacancies, the method of electing a chairman, and providing for his term of office and salary, and prescribed the salaries to be paid each commissioner, and required that such compensation be paid from the Treasury of the State of Georgia. Ga. Code, §§ 93–201 through 93–208. By § 93–304 the powers and duties conferred upon the Public Service Commission were extended to include gas and electric light and power companies. By § 93–307 the Public Service Commission was given general supervision of all utilities, including gas or electric light and power companies, and the Commission was given authority to require such utilities to establish and maintain such facilities as may be reasonable and just; to examine the affairs of such companies and to be informed as to their general condition and capitalization, their franchises and the manner in which their properties are managed, conducted, or operated. The Georgia Legislature further provided that "the power to determine what are just and reasonable rates and charges is vested exclusively in the Public Service Commission." In Georgia Code § 93–416, it is provided that should any utility subject to the supervision of the Georgia Public Service Commission fail, omit or neglect to obey, observe and comply with any order, direction or requirement of the Commission, it "shall forfeit to the State a sum of not more than $5,000 for each offense, the amount to be fixed by the presiding judge. Every violation of the provisions of this section or any other section, or of any such order, direction or requirement of the Public Service Commission shall be a separate and distinct offense, and in case of a continued violation, every day a violation thereof takes place shall be deemed a separate and distinct offense. * * * " Further, in § 93–417 of the Georgia Code it is provided that "the penalties prescribed by this Chapter and the procedure to enforce the same are made applicable to any and all violations of the rules, orders and regulations established by the Public Service Commission." Finally, the General Assembly has enacted legislation providing that every agent or employee of any public utility subject to the jurisdiction of the Georgia Commission who shall violate or procure, aid or abet any violation, or who shall fail to obey, observe or comply with any order of the Public Service Commission shall be guilty of a misdemeanor and shall be subject to prosecution in any county in which the company operates. Ga. Code, § 93–9901.

It is difficult to imagine a more comprehensive statutory scheme of regulation. Certainly, the hand of the state runs throughout every twist and turn of it. As already discussed in detail, each one of the challenged practices was the result of an order of the Georgia Public Service Commission—regardless of how the practices might have been proposed or initiated and regardless of the manner in which Commission approval was sought—and in each instance the practices were the subject of further orders changing, modifying, altering, in some cases terminating, in some cases approving and in other cases disapproving, the plans as submitted or as carried out. In the case of Underground Residential Distribution, for example, the plans as submitted by Georgia Power Company were disallowed, and the Commission dictated the manner in which the rates and services would be provided. Therefore, it is clear that the practices in question in this case were not the product of individual agreement or combination. Rather, they were the product of a legislative command of the state. Clearly, they could not have become operative or effective without that command. For this

Court to hold otherwise would place the Defendants on the classic "horns of a dilemma." Without *Parker* immunity, a public utility, such as Georgia Power Company, would be placed in the anomalous position of choosing between two conflicting laws—if the utility were to obey a Commission order it might thereby subject itself to treble damage liability under the antitrust laws; but if it chose not to obey the Commission order, relieving itself from antitrust liability, it would then be subject to criminal penalties under the laws of Georgia.

■ To apply the principles of antitrust law to activities of a regulated public utility which are carried out pursuant to an order of the state would be to defeat the very purpose of state regulation. The effect, in short, would be to render the activities of state regulatory agencies nugatory. The Court is of the opinion that Congress, in enacting the Sherman Act, recognized this difficulty and drafted the act in such a manner so as to apply only to private individuals and entities. This is what is recognized in Parker v. Brown; and this is what should control the case at bar.

The other arguments made by Plaintiff do not affect this result. Plaintiff relies on a number of antitrust cases dealing with federal agencies.[1] Those cases all concern the relationship between federal agencies and the federal courts in matters of antitrust enforcement, and the decision in each one is based upon a conclusion as to the manner in which Congress has chosen to delegate responsibility for antitrust enforcement between the agencies and the courts. Therefore, such cases do not apply here. In addition, Plaintiff cites the recent decision of Judge Oren R. Lewis, of the Eastern District of Virginia, in Washington Gas Light Company v. Virginia Electric and Power Co., 309 F.Supp. 1119 (decided January 30, 1970). In that case, Judge Lewis held that an Underground Residential Distribution Plan being used by Virginia Electric and Power Company violated Section 1 of the Sherman Act and Section 3 of the Clayton Act. The Court found that the plan amounted to an illegal tying arrangement and that, as such, it was a *per se* violation of the antitrust laws. The curious thing about the opinion is the Court's assumption that underground residential distribution and electricity are two separate products, so that one can be tied to the other as computer cards were tied to IBM machines in International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936). To my mind, Underground Residential Distribution is merely a method by which a product—electricity—is delivered to the consumer. It might be compared to a department store's delivery of merchandise bought by a customer living fifteen miles out in the country—if that customer bought a single necktie it is doubtful the store would treat the delivery the same way it would if the customer bought a wardrobe. Underground Residential Distribution is ancillary to both the seller and buyer of the product, in much the same way as a free meal given to an airline passenger is ancillary to the sale of an airline ticket. Therefore, it is difficult to see how there could be a separate tying product in the commercial sense, or how such a case could be fit within the tying clause concept.[2] At any rate, a careful reading of Judge Lewis' decision shows that no serious claim of

1. Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966); United States v. Radio Corp. of America, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959); California v. F. P. C., 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962); United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); and others.

2. For a very interesting discussion of this problem, see the article by Donald I. Baker, Chief, Evaluation Section, Department of Justice, entitled "Another Look at Franchise Tie-Ins After Texaco and Fortner." The Antitrust Bulletin, Volume XIV. Winter, 1969, page 767.

**870**

state action was ever made in the *Washington Gas Light* case to the effect that the Virginia State Corporation Commission had approved and ordered into effect the Underground Wiring Plan contested in that case. Thus, the decision of the Virginia court, while interesting, sheds no light on the issue which is now before this Court and is really irrelevant.

For the reasons stated above, the motion for summary judgment in behalf of Defendants, Georgia Power Company and The Southern Company, is hereby sustained with respect to each of Plaintiff's contentions as set forth in the Stipulation of Counsel, with the exception of the restrictive covenant referred to in sub-paragraph 2(e) thereof.