28 N.Y.2d 117 (1971)
Columbia Gas of New York, Inc., Respondent,
v.
New York State Electric & Gas Corporation, Appellant.
Court of Appeals of the State of New York.
Argued November 24, 1970.
Decided February 17, 1971.
Frederic H. Lawrence and Paul C. Gouldin for appellant.
Robert M. Diggs for respondent.
Judges BURKE, SCILEPPI and GIBSON concur with Chief Judge FULD; Judge BREITEL dissents and votes to reverse in a separate opinion in which Judges BERGAN and JASEN concur.
*121 Chief Judge FULD.
This is an action in which the plaintiff, Columbia Gas, seeks a declaration that certain contracts which defendant New York State Electric and Gas  one of the plaintiff's competitors in upstate New York  has made or wishes to make with various municipalities are violative of section 65 of the Public Service Law and section 340 of the General Business Law, the so-called Donnelly Act.
In the areas in which the plaintiff and defendant compete, Columbia Gas is the sole distributor of natural gas, New York State Electric and Gas the sole distributor of electricity. Although the plaintiff and defendant are competitors with regard to gas and electric space heating, the defendant alone enjoys a monopoly in supplying energy for lighting. During 1967, the latter was furnishing electricity to its commercial and municipal customers as a general service pursuant to its particular rate schedule (P.S.C. No. 113, Service Classification No. 2), filed with the Public Service Commission. In addition to the rate for general service, there was a special provision for space heating service available upon written application to "Any customer *122 using general service under this service classification and also using electricity as the sole source of space heating in a premises or segregated portion of a premises". Such a customer was permitted to "have the energy used for such space heating * * * separately metered" at a rate substantially less than that charged on the general service meter.
The defendant interpreted this special provision to mean that, since lighting is a source of heat, the electricity used for lighting could also be furnished through the space heating meter at the lower heating rate. In 1967, the defendant, therefore, offered the lower heating rate for lighting energy if the customer used electric heating and if the energy from lighting contributed at least 25% of the heat required for the particular building. By the end of 1967, the defendant was furnishing electricity for lighting at this special heating rate to approximately 55 customers in the Binghamton area. Objecting to this, the plaintiff commenced an action in the Supreme Court in November, 1967, challenging the defendant's interpretation of its filed rate schedule. (Columbia Gas v. New York State Elec. & Gas Corp., 56 Misc 2d 367.) The defendant moved to dismiss the complaint; the court denied the motion, holding that the complaint stated a cause of action under section 65 (subd. 5) of the Public Service Law, since the rate, as fixed by New York Electric and Gas, had not been filed with, and approved by, the commission (56 Misc 2d, at pp. 370, 372). The defendant thereafter filed amendments to its rate schedule in an attempt to formalize its practice. The commission, however, disapproved the rate and, following a hearing, directed the defendant, in November, 1968, to discontinue furnishing electricity for lighting at the space heating rate except with respect to existing customers served on that basis.
Unable to gain commission approval, the defendant sought to accomplish somewhat the same end by offering to enter into contracts with municipalities to provide such service to them on the basis set forth in the rejected amendment. The plaintiff, after learning of the defendant's plan, commenced this action in February, 1969, seeking a declaration that the contemplated agreements had the effect of (1) "granting an undue and unreasonable preference and advantage to [the defendant's] contract customers," in violation of subdivisions 2 and 3 of section 65 of the Public Service Law, and were (2) "contrary to public policy, *123 illegal and * * * violative" of section 340 of the General Business Law. The defendant moved to dismiss the complaint, and the Appellate Division, modifying the order entered at Special Term, sustained both causes of action. (Columbia Gas of N. Y. v. New York State Elec. & Gas Corp., 33 A D 2d 1057.) The case comes to this court by permission of the Appellate Division on certified questions.
The threshold challenge to the plaintiff's standing to maintain the first cause of action is quickly answered. The contracts between the defendant and local municipalities, according to the plaintiff, have the effect of sufficiently reducing lighting charges so as to overcome the economic advantage of heating with gas instead of electricity  in consequence of which, the plaintiff asserts, municipalities will be induced to use electricity (supplied by the defendant) instead of gas for space heating in the construction or remodeling of municipal buildings. This claim of economic injury, caused by the business practices of a competitor in violation of the Public Service Law (§ 65, subd. 3), is sufficient to confer standing. (See, e.g., Data Processing Serv. v. Camp, 397 U. S. 150, 152; Swan Lake Water Corp. v. Suffolk County Water Auth., 20 N Y 2d 81, 88-89; De Matteis v. McGoldrick Realty Co., 259 N.Y. 452; Brooklyn City R. R. Co. v. Whalen, 191 App. Div. 737, affd. 229 N.Y. 570.) There is no merit to the defendant's contention that, while the statute may allow a consumer to sue, it does not confer standing upon a competing public utility. It may not be gainsaid, to quote from a recent decision of the Supreme Court, that the "interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute". (Data Processing Serv. v. Camp, 397 U. S. 150, 153, supra.)
We turn, therefore, to the merits of the appeal. The substance of the first cause of action is that the defendant, by offering to sell electric lighting energy to municipalities at a special contract rate, violates the proscriptions of section 65 of the Public Service Law.[1] The effect of these contracts is to furnish certain *124 municipal customers with electricity for lighting at a lower rate than that charged other customers, thereby resulting in an "undue or unreasonable preference or advantage" to those contracting municipalities (Public Service Law, § 65, subd. 3). The defendant urges, however, that section 65 is controlled by subdivision 12 of section 66 and that, consequently, its contracts are exempt both from the prohibitions of section 65 and from the jurisdiction of the Public Service Commission.
The defendant has misconstrued the statute. Section 65 deals, as its caption indicates, with "Safe and adequate service; just and reasonable charges; unjust discrimination; unreasonable preference." Moreover, the prohibitions against discrimination and preferences set forth in the several subdivisions of section 65 are as broad as language can devise. Thus, subdivision 3 declares that "No gas corporation, electric corporation or municipality shall make or grant any undue or unreasonable preference or advantage to any person, corporation or locality". Subdivision 2 is just as broad and clear in prohibiting, "directly or indirectly, by any special rate * * * or other device or method," a gas or electric corporation or a municipality from charging anyone "a greater or less compensation for gas or electricity * * * than it charges * * * any other person or corporation for doing a like and contemporaneous service".
Subdivision 12 of section 66 deals with a completely different subject.[2] It simply exempts gas and electric corporations from the necessity of filing "state, municipal or federal contracts" relating to rates or charges. More specifically, the subdivision recites that the commission shall
"Have power to require every gas corporation, electric corporation and municipality * * * to file with the commission and to print and keep open to public inspection schedules showing all rates and charges made * * * or to be charged * * *, all forms of contract or agreement and all rules and regulations relating to rates, charges or service used or to be used". (Emphasis supplied.)
*125 Thereafter follows the clause relied upon by the defendant:
"but this subdivision shall not apply to state, municipal or federal contracts."
To say that subdivision 12, with its limited exception clause, was designed to exempt contracts with government either from the regulatory provisions of section 65 or from the regulatory powers of the commission would constitute a gross misreading and an unwarranted extension of that subdivision. Most assuredly, it may not be read to manifest a total exemption from restrictions contained in the Public Service Law. This is evident from a reading of the statute. No other subdivision of section 66 mentions this exemption for government contracts and, significantly, section 65  though it does contain certain limiting language (subds. 4 and 5)  makes no mention of exempting government contracts from its provisions.
In short, subdivision 12 merely serves the narrow function of exempting government contracts from the filing requirements set forth in section 66 and may not be read to immunize municipal contracts from the prohibitions against an "undue or unreasonable preference" found in section 65. (See, e.g., City of New York v. Maltbie, 274 N.Y. 90, 99; Matter of City of Buffalo v. New York State Public Serv. Comm., 40 Misc 2d 926.) We agree with the Appellate Division in this case that it does not "limit the [commission's] jurisdiction * * * in investigating rate setting concepts utilized in determining rates to be charged for services to be supplied under contract to municipalities. Nor does it prevent this court from determining whether defendant's offer to contract with municipalities is discriminatory or allows an unreasonable preference in violation of subdivisions 2 and 3 of section 65."
Our attention has not been called to any decision holding to the contrary. Indeed, in City of New York v. Maltbie (274 N.Y. 90, supra)  upon which our dissenting brethren seem to rely  the court expressly held that the exception contained in subdivision 12 had a narrow, limited meaning. "That section", the court wrote, "has to do with the filing of schedules and contracts * * * and the exception simply provides that the provisions of the section shall not apply `to state, municipal or federal contracts'" (274 N. Y., at p. 99). There is not the slightest intimation *126 in the Maltbie opinion that subdivision 12 of section 66 manifests any exemption, total or otherwise, from the regulatory provisions of the Public Service Law.
As analysis of the legislation clearly establishes, there is nothing in subdivision 12 or any other part of section 66 which allows one to circumvent the prohibitions contained in section 65 against unjust discrimination or unreasonable preferences. As we have already demonstrated, the latter section is designed to prevent such illicit practices, whether the customer be a private party or a municipality and whether the preferential rate is effected by contract or otherwise. The present case is quite different from New York Tel. Co. v. Siegel-Cooper Co. (202 N.Y. 502, 506), upon which the defendant relies. In that case, the court held that the New York Telephone Company could, by contract, grant the City of New York a favorable discount rate for telephone service. Significantly, though, there was no issue of unfair competition; it was a customer of the utility, not one of its competitors which initiated the suit, and the court's sole concern was whether that customer could object to a lower rate allowed a municipality. As the court pointed out (202 N. Y., at p. 506),
"[t]he controversy does not arise between the state and the plaintiff, or between the plaintiff and its stockholders, but between the plaintiff and a customer which had agreed to pay at the rate charged * * * The favored classes do not compete with the defendant in business and there is no statement as to the effect of the discrimination".
It is true that a public utility may, in fixing rates, favor a particular class of customers, such as municipalities (p. 511 et seq.), but there is no statement, in the Siegel-Cooper case or any other, that one utility may discriminate, if such discrimination violates the laws against unfair competition, placing its competitor, as it does, at a disadvantage. On the contrary, declared the court (202 N. Y., at p. 512), "`when the discrimination enures to the undue advantage of one man, in consequence of some injustice inflicted on another * * * the law intervenes for the protection of the latter' [Hays & Co. v. Pennsylvania Company, 12 Fed. Rep. 309, 311]."
*127 There is no basis for the suggestion that the plaintiff's position with respect to "municipal" contracts presents a "potential paradox" on the ground that subdivision 12 of section 66 also exempts "state" and "federal" contracts. That subdivision, as already stated, has to do merely with the filing of contracts and, since it exempts from its filing requirements all government contracts, it applies to state and federal contracts as well as those with municipalities.
In sum, then, subdivision 12 of section 66 may not be read to apply to section 65 to sanction or excuse an undue or unreasonable preference in rates or charges. To find otherwise, would allow a gas or electric corporation to circumvent the broad regulatory provisions of section 65 simply by contracting with government entities. Such a result could hardly have been contemplated.
It follows, therefore, that the first count states a good cause of action.
The plaintiff's second count charges the defendant with a violation of the Donnelly Act (General Business Law, § 340), in that it "is abusing its monopolistic position in the lighting market to restrict the freedom of municipalities to choose among competing energy sources in the space heating market." It is argued by the plaintiff that the defendant, by using the leverage of its monopolistic lighting position to encourage customers to use electricity for heating, has obtained a portion of the heating market to which it is not legally entitled.
The purpose of section 340 of the General Business Law is to prohibit "Every contract [or] agreement * * * whereby A monopoly * * * may be established or maintained, or whereby Competition or the free exercise of any activity * * * is or may be restrained". We have previously declared that section 340 encourages a "strong public policy in favor of free competition for New York" and represents "a public policy of the first magnitude." (Matter of Aimcee Wholesale Corp. [Tomar Prods.], 21 N Y 2d 621, 625, 626.)
It is apparent that the defendant's practice of offering the lighting discount solely to those customers who use electricity for space heating has the inevitable effect of inducing local municipalities to choose electricity as their energy source for heating. Such a business practice bears a superficial resemblance *128 to a tying arrangement which, by inhibiting competition in the market place, is unreasonable and illegal. (See Northern Pac. Ry. Co. v. United States, 356 U. S. 1; Fortner Enterprises v. United States Steel, 394 U. S. 495, 507.)
In a typical tying arrangement case, the seller or supplier, by virtue of his position in the market for the tying product, has sufficient economic leverage to coerce his customers to take the tied product along with the tying item. In other words, in such a case, the former refuses to sell or supply the one item unless his customer also takes the second. Here, however, the defendant does not condition the sale of electricity for lighting on the municipality's willingness to purchase electricity for space heating; instead, it simply offers lighting energy at a lower rate to those customers who purchase electricity for heating in order to promote the use of the latter. The defendant's practice, therefore, differs from a tying arrangement in that its effectiveness derives from the inducement of a lower rate for lighting rather than from a power to coerce purchases by controlling the availability of a desired product. Furthermore, although a tying arrangement necessarily involves two distinct products  the tying and the tied  here it appears that only one item, electricity, is involved. (Cf. Times-Picayune v. United States, 345 U. S. 594, 613-614; Washington Gas Light Co. v. Virginia Elec & Power Co., 438 F.2d 248; Gas Light Co. v. Georgia Power Co., 313 F.Supp. 860, 869.)
But the mere fact that the challenged practice may not be deemed a tie-in does not automatically immunize it from attack under the Donnelly Act. Even though the defendant's promotional activity is not illegal as a matter of law, it may still be unlawful if it can be shown to have actually restrained competition. (Cf. United States v. Griffith, 334 U. S. 100, 107 et seq.) Therefore, despite our reservations concerning the sufficiency of the second cause of action, we are reluctant to foreclose the plaintiff from an opportunity of factually demonstrating illegality in a comprehensive rule of reason inquiry (see, e.g., Standard Oil Co. v. United States, 283 U. S. 163, 179; Chicago Bd. of Trade v. United States, 246 U. S. 231, 238-239), especially since there will, in any event, be a trial on the merits of *129 the first cause of action. Since, then, it does no violence to the plaintiff's pleading to permit proof at the trial of possible anticompetitive effects, if any, of the defendant's promotional plan, the motion to strike the second count of the complaint was properly denied.
Finally, we agree with the Appellate Division that the plaintiff's failure to allege that notice of the commencement of this action had been given to the Attorney-General does not render the complaint defective (33 A D 2d, at pp. 1058-1059). The requirement that notice be given is designed solely "to apprise the Attorney-General that such an action was commenced so that he would be aware of the circumstances" (33 A D 2d, at p. 1059). It may not be considered a condition precedent to the plaintiff's cause of action.
The order appealed from should be affirmed, without costs, and the certified questions answered in the affirmative.
BREITEL, J. (dissenting).
This is an unusual action, unique in the State of New York, in which a gas utility, as a purported competitor of an electric utility, seeks a declaratory judgment and injunction against the electric utility on the ground that the latter is violating the Public Service Law, and the State antitrust law (Donnelly Act, General Business Law, § 340). It is alleged that the electric utility is charging discriminatory lower rates for lighting in order to tie-in electric power for space heating to favored consumers, thus harming the gas utility which merchants gas for space heating. A crude, but not too remote analogy, would be an action by a steel corporation against an aluminum company on the ground that the aluminum company is practicing price discrimination and tie-in sales in promoting aluminum as a substitute building material for steel in the construction of buildings. A difference here, however, is that a public utility is alined on each side of the litigation, each subject to close statutory and administrative regulation by the Public Service Commission.
Before reaching the consequences which flow from the public utility status of the litigants there is an unusual issue of standing.[*] All of the New York cases relied upon by plaintiff to show *130 standing involved, as defendant argues, encroachment on a franchise, and, thus, the invasion of a property interest (e.g., De Matteis v. McGoldrick Realty Co., 259 N.Y. 452; Brooklyn City R. R. Co. v. Whalen, 191 App. Div. 737, affd. 229 N.Y. 570; Surface Transp. Corp. v. Reservoir Bus Lines, 271 App. Div. 556; International Ry. Co. v. Barone, 246 App. Div. 450; Kingsbridge Ry. Co. v. City of New York, 204 App. Div. 369). In most of these cases there was an invasion by another transportation company of a transportation route granted by exclusive franchise, sometimes but not always involving the same kind of vehicle. Under traditional rules, the plaintiff had a right to protect its property interest in the franchise, and, of course, there was no claim of antitrust law violation.
Actually, there have been few cases, and none in this State, in which a competitor has sued or defended against another in private litigation based on a public service law or an antitrust law violation which did not involve a transaction between them. The few cases that have arisen elsewhere did not result in judgment in favor of the plaintiff (e.g., Tennessee Power Co. v. T. V. A., 306 U. S. 118). By happenstance, while this action was pending, the Supreme Court reversed the lower Federal courts and propounded a new test of standing in Data Processing Serv. v. Camp (397 U. S. 150). Under the broad "zone of interests" test, which now seems to have displaced the older "legal interest" test, a competitor may have standing to protest a harmful administrative determination or to sue if an available statute has as its purpose the protection of the suitor as distinguished from the public (id., pp. 154-155). As will be seen, plaintiff hardly satisfies these tests. But there is no doubt that the new Federal rule, which does not necessarily determine the State rules on standing, might broaden the horizon for standing in State cases and it may be that the horizon extends even further. That being so, it may be better for the purposes of this action to assume that plaintiff does have standing, extremely doubtful though it be.
A more serious problem in this case is whether tie-in sales, assuming that defendant is guilty of such practices, are covered by the Donnelly Act. This depends upon whether the Donnelly Act language, almost identical with that of the Sherman Antitrust Law, suffices to condemn tie-in sales (U. S. Code, tit. 15, *131 § 1). While the Clayton Act is more specific in its condemnation of "tying" arrangements, Federal courts have held that tie-in sales may also constitute a violation of the more general language of the Sherman Act (U. S. Code, tit. 15, § 14; Northern Pac. Ry. Co. v. United States, 356 U. S. 1, 5-6; Times-Picayune v. United States, 345 U. S. 594, 605). Be that as it may, it does not necessarily follow that New York courts will or should give their similar statute the same interpretation. They have not before this, and there is no compulsion, logical or otherwise, that they do so. But again, in order to reach the merits which should be more decisive, it is assumed that tie-in sales are covered by the Donnelly Act. It is also accepted that whether defendant can justify the differential rates it charges to municipalities that use electricity for space heating on the economy of "unit-size" transactions, that is, the economy resulting from the sale of larger rather than smaller quantities to the same consumer, is at least a question of fact.
One may also agree that plaintiff's failure to give notice of this action to the Attorney-General is not, or at least should not, be fatal to the complaint (General Business Law, § 340, subd. 5). The failure to give such notice, however, and the requirement that such notice be given points up the possible confusion between the "private" and "public" character of this litigation. Moreover, it is most unfortunate that in this very case the views of the Attorney-General have not been brought before the court to give a "public", including the Public Service Commission's, point of view on the issues.
The reef upon which this litigation should founder is the scope and content of regulation of gas and electric utilities under the Public Service Law.
Section 65 of the Public Service Law provides for the standards and rates of service to be furnished by gas and electric utilities and, notably, also by municipal corporations. As to standards and rates, they must conform with law or be authorized by the Public Service Commission. The section (consisting of six relevant subdivisions, in three expressly, in three impliedly) imposes regulation dependent upon the action of the Public Service Commission in fixing rates and standards of service. It is in this context that prohibitions on rates and other unfair discriminations are found. No part of the section makes *132 sense except when read against the power of the commission to vary the rates and practices, e.g. in allowing a "sliding scale" of rates as provided in subdivision 4, or to use "unit-size" differentials as permitted by subdivision 5.
It is section 66 of the same law governing the powers of the commission which provides the exemption under which defendant contends it is entitled to make the agreements it has made with municipalities, without running afoul of the Public Service Law or the antitrust law. Subdivision 12 exempts from its provisions "contracts" by gas and electric utilities with the State, the Federal Government, or municipalities. The subdivision, it is true, deals with the filing and approval of rates and standards of service. But that is how section 65 is designedly implemented. Hence, the exemption evidences a complete one of governmental contracts from commission control and, therefore, from regulation by the statute as well. The statutory scheme is obvious and traditional for almost a century in giving all utility regulatory power to the administrative agency. For reasons readily apparent none would wish to leave an area of public utility regulation to the courts and the clumsiness of private litigation in common-law form.
In the analogous situation affecting water companies under substantially similar statutes this court made clear the exempted status of contracts with municipalities. Thus, in City of New York v. Maltbie (274 N.Y. 90), it was said: "That section has to do with the filing of schedules and contracts by water works corporations and the exception simply provides that the provisions of the section shall not apply `to state, municipal or federal contracts.' The section has nothing to do with the general jurisdiction granted to the Public Service Commission to fix rates only as it constitutes a limitation of that power. At the time the order was made by the Public Service Commission, the city did not have a contract with the water company for furnishing hydrant service. The limitation contained in section 89-c, subdivision 10, `but this subdivision shall not apply to state, municipal or federal contracts,' has no application under the facts here involved. A different question would be presented if at the time the order of the Public Service Commission was made, a contract had been in existence between the city and the water company and the Commission had attempted by order to abrogate *133 and nullify such contract. When there is in existence a contract between a municipality and a water works company for water for a public use, the Public Service Commission is without authority to fix a rate therefor. If, however, there is no contract in force, the Commission upon written complaint as provided for in section 89-i shall conduct an investigation and fix a rate. The broad public policy involved in vesting in the Public Service Commission authority to fix the rates of public service corporations does not apply to the fixing of a rate when there is in existence a contract entered into between a municipal corporation and a water works company." (id., at p. 99). (To the same effect, see Jamaica Water Supply Co. v. City of New York, 279 N.Y. 342, 347-349.)
Nor is this interpretation of the statutory scheme novel. As early as 1920, the Public Service Commission recognized the exempted status of "state, municipal, and federal contracts", and refused to narrow the exemption to filing requirements. In Complaint against Elmira Water, Light & R. R. Co. (23 State Dept. Rep. 398) the commission was presented with an attempted abrogation by the utility of a contract by it with a municipality for street lighting by a subsequent filing of a tariff schedule. It was said of the filing exemption in the commission opinion: "A narrow construction of this limitation is urged by this respondent, to the effect that this merely does away with the necessity of filing State, municipal or Federal contracts with this Commission. This narrow interpretation of the restriction, however, would render it practically meaningless. The object of the enactment was evidently to except from the machinery in reference to fixing rates, and our consequent jurisdiction, all contracts made by State, municipal, or Federal authorities with electric lighting companies." (id., at p. 400).
The reason for distinguishing contracts with governments is not dependent merely upon statutory differences; a different policy is involved (cf. 1 Pond, Public Utilities [4th ed.], § 195, entitled, "Contracts with municipal and private parties distinguished"). As defendant argues, discrimination in favor of governments acting on behalf of the public does not involve discrimination among members of the public. This was noted and commented upon at length in New York Tel. Co. v. Siegel-Cooper Co. (202 N.Y. 502) in justifying, on a variety of grounds, the *134 granting of favorable telephone rates to the City of New York. (Cf. People ex rel. Village of South Glens Falls v. Public Serv. Comm., 225 N.Y. 216, 221-225.) Interestingly, the Siegel-Cooper case commented at some length on all sorts of preferences granted to charities, clergymen, and others, as not violative of any scheme for fair and equal rates among other members of the public. It reasoned that if such preferences were permissible, so were they for cities. (See 1 Pond, op. cit., supra, § 289; Nichols, Public Utility Service and Discrimination, Managerial Problems, Regulations and Practices [1928], pp. 913-914, 935 et seq. [pointing out, however, possibilities of unfairness to general taxpayers].)
As for the different statutory treatment between filed rates charged to municipalities and rates fixed by contract, the reason again is simple. Filed rates are unilaterally imposed by the utility and, therefore, commission approval is indicated to avoid uncontrolled abuse. On the other hand, rates fixed by contract with a government, presumably a relatively strong bargainer, are perforce fixed bilaterally.
That the effect of this view would entail loss through competition to plaintiff is legally immaterial, since it would be a competitive loss sustained by plaintiff as a result of what, under existing statutes, is a lawful activity by defendant. It should be pointed out, however, that only a limited competition and, therefore, a limited loss is the possible lot of plaintiff. Only contracts, in this case made with municipalities for municipal lighting and heating purposes, would be exempted from the practices condemned by section 65 and the Donnelly Act. The matter may be stated another way: Contracts with municipalities are exempted from section 66 and, therefore, section 65; and because discrimination in favor of the municipalities is not harmful to the public (whatever the effect on the gas competitor) such discrimination is not unreasonable at common law or under the Donnelly Act.
What should not be confused with the issues in the present case is the earlier effort of defendant by filed rates, rejected by the commission, to provide jointly lower rates for all users of electricity for space heating and lighting. That rejected schedule was not limited to municipalities and, hence, could not come under the section 66 exemption, even apart from the fact that the offending rates were not fixed by contract.
*135 On a broad view, the practical results of these conclusions are not horrendous or surprising. It is one thing for a competitor to have standing or a protectible legal interest because it is harmed by activity harmful to the public. It is quite another for it to have standing, or a legally protected interest, where it is harmed alone; the public is not, and the Legislature has not seen fit to accord it a right and a remedy in an area where at the common law and under the statutes the activity is lawful even if it harms competitors unless the public too is harmed.
Throughout most of this century there has been a dramatic struggle in and out of the Legislature to bring cheap power to the people of the State. Much of that struggle was through the development of municipal power plants and municipal distribution systems. It is in this historical context that one may better understand the exemption of municipalities from the regulation of rates fixed by them in contracts with private utilities. (See, generally, VI N. Y. State Const. Conv. Comm. 1938, ch. XXIV, Regulation of Public Utilities and Public Ownership, pp. 340-439, esp. pp. 362-366, with respect to regulation of rates charged by municipal utilities.) Until now, evidently, there has been no fear of abuse by or through municipalities in the purchase of power by contract. Should such abuse arise, it will be easy enough for the statute to be changed.
Moreover, if plaintiff were correct in its contentions there would be a potential paradox. Section 66 also exempts contracts with the State and the Federal Government. If the State were to make the same contract as defendant is making or proposing to make with a few municipalities, it is difficult to believe that plaintiff would have a good cause of action under either branch of its complaint. And, while only passing reference is made by defendant to a defect of parties, it is equally difficult to believe that the State would not be an indispensable party, as should be the municipality which may have its contract or prospective contracts indirectly struck down in this action, if plaintiff were to prevail.
The short of the matter is that utilities are rarely if ever subject to antitrust laws. Utilities by their nature are monopolies, intended so to be for reasons of efficiency and economy, but subject to governmental regulation. An enterprise other than a utility is not permitted to be a monopoly with some exceptions *136 (e.g., patentable inventions and copyrightable publications). It is to such enterprises, forbidden to be monopolies to which antitrust laws apply  obviously; the statement is circular because definitional. The point of all this is that antitrust laws forbid monopolies while public utility law allows them, subject to regulation. In their nature there is or should be generally a mutual exclusion. When, and it may even be often, it is desirable to prohibit excessive monopolistic practices by utilities affecting others, the agency for regulation is the Public Service Commission operating within its statutorily defined regulatory powers. Put another way, the traditional mode of control of lawful monopolies is by administrative regulation, not by private litigation and not through the misapplication of antitrust laws designed to promote and preserve competition.
Accordingly, I dissent and vote to reverse and dismiss both causes of action.
Order affirmed, etc.
NOTES
[1] Section 65 (subd. 2) prohibits any gas or electric utility from charging or receiving "a greater or less compensation for gas or electricity" than that which is charged or received from any other person for "a like and contemporaneous service". Section 65 (subd. 3) prohibits "any undue or unreasonable preference or advantage to any person, corporation or locality".
[2] Section 66 of the Public Service Law bears the caption, "General powers of commission in respect to gas and electricity."
[*] An interesting variation on this action, also involving a question of standing, would be one by fuel oil distributors to enjoin defendant from engaging in its "unlawful" practices on the ground that they are harmed as competitors in providing supplies for space heating.